# United States Court of Appeals
# for the Federal Circuit

---

**MOBILE SCANNING TECHNOLOGIES, LLC,**

*Appellant,*

v.

**MOTOROLA SOLUTIONS, INC.,**

*Appellee.*

---

Appeal from the United States Patent and Trademark Office
Patent Trial and Appeal Board
Case No. IPR2013-00093
U.S. Patent No. 6,065,880
Issue Date: May 23, 2000
Title: LASER ENHANCED PERSONAL DATA ASSISTANT

Before, SCOTT R. BOALICK, GLENN J. PERRY and
BRIAN J. McNAMARA, *Administrative Patent Judges*

---

## APPELLANT'S PRINCIPAL BRIEF

---

CHARLES J. ROGERS
CONLEY ROSE, P.C.
1001 MCKINNEY STREET, SUITE 1800
HOUSTON, TX 77002
(713) 238-8049
*Principal Attorney*

**Attorney for Appellant Mobile Scanning Technologies, LLC**

October 28, 2014

# CERTIFICATE OF INTEREST

Counsel for Patent Owner-Appellant Mobile Scanning Technologies, LLC certifies the following:

1.  The full name of every party or amicus represented by me is:

    Mobile Scanning Technologies, LLC

2.  The name of the real party in interest represented (if the party named in the caption is not the real party in interest) by me is:

    Not applicable.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

    None

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

Conley Rose, P.C.

Charles J. Rogers

Paul M. Schwartz
Mobile Scanning Technologies, LLC

  /s/Charles J. Rogers
Charles J. Rogers
Conley Rose, P.C.
1001 McKinney Street, Suite 1800
Houston, TX  77002-6421
Telephone: (713) 238-8049
Facsimile: (713) 238-8008
E-mail: CRogers@conleyrose.com

Principal Attorney for
Appellant
Mobile Scanning Technologies, LLC

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ...................................................................... i

TABLE OF CONTENTS ............................................................................ ii

TABLE OF AUTHORITIES ...................................................................... iv

TABLE OF ABBREVIATIONS .................................................................. vi

STATEMENT OF RELATED CASES ........................................................ vii

I.      STATEMENT OF JURISDICTION ............................................... 1

II.     STATEMENT OF THE ISSUES ..................................................... 1

III.    STATEMENT OF THE CASE ......................................................... 1

        A.      Preliminary Statement ........................................................ 1

        B.      Procedural History ............................................................. 3

        C.      Statement of Facts ............................................................. 3

                1.      The Claimed Invention ........................................... 3

                2.      Motorola Files Petition for IPR .............................. 7

                3.      The PTAB Institutes IPR ......................................... 8

                4.      The PTAB Issues Its Final Decision Cancelling Claims
                        18-20 and Denying MST's Motion to Amend The Claims ...... 10

IV.     SUMMARY OF ARGUMENT ....................................................... 11

V.      ARGUMENT ................................................................................... 14

        A.      Standard of Review ............................................................ 14

        B.      The PTAB Erred In Its Construction of "PDA" by Applying
                The Incorrect BRI Standard. ............................................... 15

1. The PTO lacked substantive rulemaking authority to require the application of the BRI standard in IPR proceedings ...................................................................... 15

2. The BRI standard is not appropriate for an IPR proceeding ........................................................................ 17

C. The PTAB's Construction of "PDA" Is Incorrect under The BRI Standard and *Phillips* ................................................. 19

D. The PTAB Erred in Cancelling Claims 18-20 under §§ 102 and 103. ....................................................................... 22

1. Ruppert and PPT4100 do not disclose all limitations of Claim 18. ......................................................................... 22

2. Neither Ruppert and Dvorkis nor PPT4100 and SE1000 render obvious all limitations of Claim 18. .......................... 24

E. The PTAB Erred in Determining MST's Proposed Amended Claims Failed The Written Description Requirement and Did Not Add Patentable Subject Matter. .................................... 27

VI. CONCLUSION AND RELIEF REQUESTED ............................................. 29

ADDENDUM ............................................................................. A1-34

PROOF OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**U.S. Supreme Court Cases**

City of Arlington v. FCC,
　133 S. Ct. 1863 (2013) ...........................................................................14

Consolidated Edison Co. v. N.L.R.B.,
　305 U.S. 197 (1938) ...............................................................................15

**U.S. Court of Apeals Cases**

Belkin International, Inc. v. Kappos,
　696 F.3d 1379 (Fed. Cir. 2012).............................................................14

Capon v. Eshhar,
　418 F.3d 1349 (Fed. Cir. 2005).............................................................27

Cooper Technologies Co. v. Dudas,
　536 F.3d 1330 (Fed. Cir. 2008)..................................................... 15, 16

In re Construction Equipment Co.,
　665 F.3d 1254 (Fed. Cir. 2011).............................................................15

In re Garner,
　508 F.3d 1376 (Fed. Cir. 2007).............................................................14

In re Gartside,
　203 F.3d 1305 (Fed. Cir. 2000).............................................................15

In re Morris,
　127 F.3d 1048 (Fed. Cir. 1997).............................................................20

In re Pacer Technology,
　338 F.3d 1348 (Fed. Cir. 2003).............................................................14

In re Skvorecz,
　580 F.3d 1262 (Fed. Cir. 2009)..................................................... 16, 18

In re Suitco Surface, Inc.,
　603 F.3d 1255 (Fed. Cir. 2010).............................................................20

In re Yamamoto,
　740 F. 2d 1569 (Fed. Cir. 1984).............................................................18

Lighting Ballast Control LLC v. Philips Electronics. North America Corp.,
　744 F.3d 1272 (Fed. Cir. 2014) (en banc)............................................14

Markman v. Westview Instruments, Inc.,
  52 F.3d 967 (Fed. Cir. 1995) (en banc),
  aff'd, 517 U.S. 370 (1996) ...................................................................17

Phillips v. AWH Corp.,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc)..................................... passim

Source Search Techs., LLC v. LendingTree, LLC,
  588 F.3d 1063 (Fed. Cir. 2009)...........................................................17

Tafas v. Doll,
  559 F.3d 1345 (Fed. Cir. 2009)...........................................................15

**Statutes**

28 U.S.C. § 1295 ...................................................................................1

35 U.S.C. § 103 .............................................................................. 1, 22

35 U.S.C. § 112 .................................................................................17

35 U.S.C. § 2 ............................................................... 11, 15, 16, 17

35 U.S.C. § 316 ........................................................................ 16, 18

35 U.S.C. § 319 ...................................................................................1

35 U.S.C. § 6 .......................................................................................1

35 U.S.C. § 102 .............................................................................. 1, 22

**Rules and Regulations**

37 C.F.R. § 42.100 ........................................................... 11, 15, 17

37 C.F.R. § 42.121 .............................................................................19

37 C.F.R. § 42.20 .............................................................................18

Fed. Cir. Rule 47.5 ......................................................................... vii

MPEP § 2163 .....................................................................................27

# TABLE OF ABBREVIATIONS

*Parties*

| | |
|---|---|
| MST | Patent Owner-Appellant Mobile Scanning Technologies, LLC |
| Motorola | Petitioner-Appellee Motorola Solutions, Inc. |

*Cites*

| | |
|---|---|
| A__ | Joint Appendix at page(s) __, with (column:lines) for patents |

*Terms*

| | |
|---|---|
| '880 Patent | U.S. Patent No. 6,065,880 to MST |
| AIA | Leahy-Smith America Invents Act |
| BRI | Broadest Reasonable Interpretation |
| Court | United States Court of Appeals for the Federal Circuit |
| Dvorkis | U.S. Pat. No. 5,552,592 to Dvorkis et al. |
| IPR | *Inter Partes* Review |
| Petition | Motorola's Petition for *Inter Partes* Review of the '880 Patent |
| PPT4100 | PPT4100 System Administration Manual |
| PTAB | Patent Trial and Appeal Board |
| PTO | United States Patent and Trademark Office |
| Ruppert | U.S. Pat. No. 5,424,524 to Ruppert et al. |
| SE1000 | SE1000 Series Integration Guide |

**STATEMENT OF RELATED CASES**

Pursuant to Federal Circuit Rule 47.5, Mobile Scanning Technologies, LLC states as follows:

(a) There have been no previous appeals in this proceeding.

(b) It is not aware of any other case that will be directly affected by the Court's decision in this case, other than the pending ***Ex Parte*** Reexamination No. 90/012481 of the '880 Patent, which the PTAB has stayed pending the outcome of this IPR. A140-43.

# I.   STATEMENT OF JURISDICTION

The PTAB had jurisdiction over Motorola's Petition under 35 U.S.C. § 6. The PTAB issued a Final Written Decision on April 24, 2014. A1-21. MST timely filed its Notice of Appeal on June 25, 2014. A539-43. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 319.

# II.   STATEMENT OF THE ISSUES

1.   Whether the BRI standard applies to IPR proceedings, and whether the PTAB erred by construing the term "PDA" as "a substantially hand-sized computer used for storing and manipulating an amount of data and capable of exchanging information with a host"?

2.   Whether the PTAB erred in cancelling Claims 18-20 under one or both of 35 U.S.C. §§ 102 and 103?

3.   Whether the PTAB erred in denying MST's motion to amend the claims?

# III.   STATEMENT OF THE CASE

## A.   Preliminary Statement

This appeal arises from Motorola's Petition for IPR filed December 20, 2012. In its Petition, Motorola challenged Claims 18-20 of the '880 Patent, relying on 44 different grounds of anticipation and obviousness based on several patents and numerous publications alleged to be prior art. The PTAB rejected all proffered

grounds except for: the rejection of Claim 18 as anticipated by Ruppert (A1527-40); the rejection of Claim 18 as anticipated by PPT4100 (A878-970); the rejection of Claim 20 as anticipated by PPT4100; the rejection of Claims 18-20 as obvious over Ruppert and Dvorkis (A1829-52); and the rejection of Claims 18-20 as obvious over PPT4100 and SE1000 (A1709-1828).

As part of instituting the IPR, the PTAB construed the claim term, "PDA," utilizing the BRI standard, as encompassing all "substantially hand-sized computer[s] used for storing and manipulating an amount of data and capable of exchanging information with a host." The PTAB erred in its construction first by applying the BRI standard reserved for examination of applications and reexamination of issued patents, rather than applying claim construction rules set forth by this Court in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). The PTAB further erred in its construction by adopting a claim construction of "PDA" so broad that it includes devices that would have been understood by one skilled in the art <u>not</u> to be PDAs, due in part to their lack of data syncing functionality associated with PDAs at the time of invention. The PTAB also erred in denying MST's motion to amend the claims for lack of written description, and failed to address MST's rationale for why such amended claims would be non-obvious over the art cited in the rejections adopted by the PTAB.

In light of the improper application of the BRI—and the promulgation by the PTO of a rule that exceeded its authority—it is essential in the present appeal that the Court provide guidance to the PTO and the PTAB regarding the appropriate claim construction standards for IPR proceedings. Thus, the Court should reverse the PTAB's decision cancelling Claims 18-20. In the alternative, Appellant respectfully requests that this Court reverse and remand to the PTAB for application of the proper claim construction standard to Claims 18-20, and reconsideration of MST's motion to amend.

## B.    Procedural History

On December 20, 2012, Motorola filed a petition for IPR, requesting IPR with respect to Claims 18-20 of the '880 Patent. A38-41, 97-98. For each claim, Motorola asserted multiple grounds of unpatentability. A40.

On April 29, 2013, the PTAB issued its Decision to Initiate Trial for Inter Partes Review as to Claims 18-20. A187-224. On April 24, 2014, the PTAB issued its Final Written Decision cancelling Claims 18-20 and denying MST's motion to amend the claims. A1-21.

## C.    Statement of Facts

### 1.  The Claimed Invention

The invention disclosed and claimed in the '880 Patent relates to a PDA—a mobile device known at the time of the invention to function as a personal

information manager, for managing and <u>synchronizing</u> personal data (*e.g.* calendar, address book, etc.) with a host computer (transferring data between the device and the computer to download *and* upload information). A22-34 (1:7-16), A2782-83, 2786-88. The '880 Patent identifies the PalmPilot® as one such example of a PDA and its functionality. A28 (1:13-16).

The '880 Patent discloses and claims improvements to the PalmPilot® to allow for wireless syncing using an LED or infrared laser light connection, freeing the PalmPilot® from its HotSync cradle. *See* A1856-1924, Pilot Handbook, showing the HotSync cradle connected to a host computer at A1864. Prior to the invention, the PalmPilot® and other PDA devices had to be physically or electrically connected (by a wire) to their host computer for data syncing. A28 (1:17-28) ('880 Patent Background of the Invention section describing the syncing cradle connected the host computer as a shortcoming of PDAs that limit their use). Prior to the invention, PDAs did not have the wireless syncing capability that we take for granted now with our smartphones.

The '880 Patent discloses two different embodiments of the invention, one using an L-shaped adapter that houses the electronics to accomplish the wireless syncing (A28 (1:48-56)), and another embodiment that integrates the wireless syncing electronics of the adapter into the PDA, to eliminate the need for the adapter (*id.* (2:21-26)). Claims 1-9 are directed to an adapter. A30 (6:1-38).

Claims 10-17 are directed to a combination of a PDA and the L-shaped adapter. *Id.* (6:39-67 to 7:21-24). And the final Claims 18-20 are directed to a PDA with the wireless syncing electronics integrated into the PDA itself. *Id.* (8:1-22). Claims 18-20 are the only claims of the '880 Patent at issue in this IPR.

Claim 18, after reexamination, recites the PDA as a "single embedded PDA design" to emphasize the integration of the wireless syncing electronics into the PDA. A34 (2:2).

In addition to wireless syncing, the same electronics used for the wireless syncing could then allow the PDA to function as a bar code scanner. A28 (2:5-24). The '880 Patent describes the bar code scanning capability as substantially increasing the functionality of the PDA, which then, for example, could be used as an inventory monitoring and controlling device. *Id.* (2:16-20).

The wireless syncing improvement to the PalmPilot® resulted in the first PDA having an integrated bar code scanner. Claims 18-20 expressly recite a *single embedded PDA* including laserscanning functionality, which allows such a device "to effectively monitor and control inventory or other products on which bar codes can be positioned." A22-34 (2:15-20 and Claims 18-20). A perspective view of the device of Claims 18-20 of the '880 Patent is reproduced below for reference.



Again, the '880 Patent discloses and claims a *single embedded* **PDA**, which was known to possess certain features, and particularly having enhanced data transmission and receiving capabilities realized as follows:

*A. Data Reception (Bar Code Scanning)*

(a) Laser 44 generates and emits a thin highly collimated light beam 47 through the top end 62 of PDA 60 to illuminate a bar code 54;

(b) Analog to digital converter 58 converts the portion 61 of light beam 47 reflected off of the reflective sections of bar code 54 (an analog signal) to a digital signal for receipt and processing by micro controller 58; and

(c) Micro controller decodes the digital signal to process, store and display the received data and related information on the PDA.

*B. Data Transmission*

(a) Laser 44 generates and emits a thin highly collimated light beam 47 for receipt by an external device such as host computer 70; and

(b) Analog to Digital Converter Means such as, for example, Switch 48 or LCD 52, converts the light beam 47 emitted by Laser 44 into a digital signal which can be transmitted over extended distances for receipt and decoding by computer 70.

A29 (4:7-15 and 53-67).

Claim 18, which includes all embodiments of the disclosed embedded PDA device, recites:

18.    A PDA comprising:
    a single embedded PDA design comprising:
        (a) a housing having a front face extending between a top end and an opposing bottom end, a display screen is positioned on the front face and an interface connector is positioned at the bottom end,
        (b) a microcontroller is disposed within the housing and is electrically coupled to the connector;
        (c) a laser is disposed within the housing and is configured to emit a light beam through the top end of the housing;
        (d) an analog to digital converter is disposed within the housing and is electrically coupled with the microcontroller;
        (e) a photo detector is positioned at the top end of the housing and is configured to receive reflected light from the laser.

Claims 19 and 20, which depend from Claim 18, are directed to various further details regarding the laser ("wherein the laser emits a visible red light that is sufficiently collimated to function as a pointer") (A22-34 (Claim 20)), and photo detection and conversion devices ("means for converting light from the laser into a digital signal") (A22-34 (Claim 19)).

## 2. Motorola Files Petition for IPR

On December 20, 2012, Motorola filed a petition for IPR, requesting IPR with respect to Claims 18-20 of the '880 Patent. A38-41, 97-98. In its Petition, Motorola proffered an allegedly express definition of the claim term "PDA" from the '880 Patent specification. A50. In Sections III and IX of its Petition, Motorola

proposed 44 separate grounds of invalidity for Claims 18-20 of the '880 patent. A43-44. Each argument relies on various overlapping combinations of references. 38 of the asserted grounds of invalidity rely in whole or in part on one or more combinations of the 9 non-patent references. *Id.* The remaining 6 grounds of invalidity are based on Ruppert, Dvorkis, and U.S. Patent No. 5,736,726 to VanHorn, alone and in combination. *Id*.

On February 8, 2013, MST filed a Preliminary Response to the Petition, presenting arguments why an IPR of the '880 patent should not be instituted. A144-45, 176. Among other things, MST stressed the appropriate construction for the claim term "PDA," which was both consistent with the '880 Patent specification and the understanding of one of ordinary skill in the art at the time of invention. A166-67.

### 3. The PTAB Institutes IPR

On April 29, 2013, the Patent Trial and Appeal Board ("Board") issued a decision (the "Decision") instituting an IPR of the '880 patent. A187-224. In its Decision, the Board construed the term "PDA" as used in Claims 18-20 of the '880 Patent to mean "a substantially hand-sized computer used for storing and manipulating an amount of data and capable of exchanging information with a host." A197. In declining to adopt a construction of "PDA" that includes a requirement of synchronizing data with a host computer, the Board noted that the

Patent Owner did not "provide documentary evidence to support a definition of PDA that would require a 'synchronization' function that represents or arranges events to indicate coincidence or coexistence." A194.

Based largely in part on the adopted construction of the term "PDA," the Board granted the Petition with respect to the following grounds: the rejection of Claim 18 as anticipated by Ruppert; the rejection of Claim 18 as anticipated by PPT4100; the rejection of Claim 20 as anticipated by PPT4100; the rejection of Claims 18-20 as obvious over Ruppert and Dvorkis; and the rejection of Claims 18-20 as obvious over PPT4100 and SE1000.

### a) The PTAB's construction of "PDA" under the BRI standard

The PTAB adopted in large part the supposed "broadest reasonable construction" or BRI of the term "PDA" to mean "a substantially hand-sized computer used for storing and manipulating an amount of data and capable of exchanging information with a host." A197. The only support for the PTAB's construction is the beginning of an explanation of a PDA in the '880 Patent. A28 (1:11-13). Indeed, the '880 Patent goes on to further explain by way of an example that one embodiment of a PDA, which was certainly well-known at the time of invention, was the PalmPilot®. *Id.* (1:13-16). Further, the PTAB has not acknowledged that numerous devices that one of ordinary skill in the art would understand <u>are not</u> PDAs read on the adopted, supposedly reasonable interpretation

9

of the term "PDA," due in part to their lack of data syncing functionality associated with PDAs at the time of invention

### 4. The PTAB Issues Its Final Decision Cancelling Claims 18-20 and Denying MST's Motion to Amend The Claims

On April 24, 2014, the PTAB issued a Final Written Decision cancelling Claims 18-20 of the '880 Patent, and denying MST's motion to amend the claims. A1-21.

The PTAB noted that neither MST nor its expert Dr. Sidhu cited to the '880 Patent to support the fact that the term "PDA" requires the ability to synchronize data with a host computer, A6-7, despite this being a well-known and understood feature of the disclosed exemplary PalmPilot® device. As a result, the PTAB maintained its previous construction under BRI of the term "PDA" and cancelled Claims 18-20 based on the grounds outlined above. A9.

The PTAB also denied MST's motion to amend the claims. A18-20. MST filed a motion to substitute new Claims 21-23 for Claims 18-20, respectively. Proposed independent Claim 21 recited the limitations of Original Claim 18, but further required that the PDA be "configured to exchange and synchronize data with a host computer." A337-49. The PTAB held that this limitation lacked written description support and, based solely on statements from the Oral Hearing but not the remainder of the record, would not have been non-obvious in view of the art of record. A18-20.

## IV. SUMMARY OF ARGUMENT

*Claim construction.*

First, the PTAB inappropriately utilized the BRI standard reserved for PTO examinational proceedings. The BRI standard is inappropriate for IPR proceedings and is not authorized by the PTO's limited rulemaking abilities. In fact, Congress has not granted the PTO authority to promulgate substantive rules. 35 U.S.C. § 2(b)(2) only permits the PTO to "establish regulations … which … shall govern the <u>conduct</u> of proceedings in the Office…" (emphasis added). Thus, Congress has granted the PTO procedural rulemaking authority, but not substantive rulemaking authority. However, in spite of this, the PTO promulgated 37 C.F.R. § 42.100(b), which provides that claims in an unexpired patent be given their "broadest reasonable construction in light of the specification of the patent in which it appears." This newly-promulgated regulation goes well beyond procedural rulemaking, but rather affects substantive outcomes including patentability. In IPR proceedings, which are adjudicatory in nature rather than for the purposes of examination (where claims may be amended more freely), the ***Phillips*** standard should be applied to construe claim terms.

Second, even under the BRI, the PTAB construed the term "PDA" in an overly-broad and thus unreasonable manner because the adopted construction reads on a number of devices that would be understood <u>not</u> to be PDAs, due in part to

their lack of data syncing functionality associated with PDAs at the time of invention. The PTAB construed the term "PDA" to mean "a substantially hand-sized computer used for storing and manipulating an amount of data and capable of exchanging information with a host." However, as has been previously set forth in the IPR record, such a construction includes a number of devices that one of ordinary skill in the art would have understood to not be PDAs, and thus is an overly-broad construction of the term "PDA."

*The PTAB erred in cancelling Claim 18.*

For the purposes of this appeal, Claims 18-20 stand and fall together. The PTAB's determination that Claims 18-20 were not patentable over the adopted rejections was predicated on an improper construction of the recited claim term "PDA." Based on this improper construction, the PTAB found that certain of the references disclosed such a device. That is, Claims 18-20 were cancelled because Ruppert and PPT4100 were held to contain the features required by the PTAB's impermissibly-broad (or overly-broad, at best) construction of the term "PDA." However, regardless of the construction of the term PDA, both Ruppert and PPT4100 lack features that were known by one of ordinary skill in the art at the time of invention to be present in a "PDA," and thus do not disclose a PDA device.

*The PTAB erred in denying MST's motion to amend the claims.*

MST specifically drafted Claim 18 to require a "single embedded PDA design," which is a handheld computer having particular features. Had MST intended Claim 18 to refer to all devices that satisfy the PTAB's adopted definition, claiming solely a "PDA" would have been overly-limiting. The proposed amended Claims eliminated any such confusion, while serving to further limit Claims 18-20 by specifically reciting one of the distinguishing features of PDAs relative to the overly-broad construction adopted by the PTAB. Further, one of ordinary skill in the art would have understood that these proposed amendments referred to features present in PDAs (*e.g.*, the PalmPilot®), and thus would also have understood that MST possessed the invention sought to be claimed in the proposed amended claims.

Finally, the PTAB denied the motion to amend for not adding patentable subject matter based on a supposed comparison of the feature sought to be required by the proposed substitute claims. A18-20. However, the PTAB only addressed the features of original Claim 18 relative to the cited references and did not address whether those cited references disclosed or suggested the features of proposed substitute Claim 21. And even then, the PTAB's rationale for why MST's proposed construction would not alter the determination of unpatentability was flawed. The PTAB noted that the '880 Patent specification "states that the PDA is

conventional," and that Ruppert and PPT4100 disclose "the incorporation of the claimed elements into a conventional device." ***See, e.g.***, A13. However, it does not follow that because a PDA is conventional, that any conventional device is a PDA. Regardless, the PTAB did not at all address whether Ruppert and PPT4100 disclose <u>synchronization</u> of data as required by proposed substitute Claim 21.

## V.     ARGUMENT

### A.     Standard of Review

Claim construction is reviewed ***de novo***. ***Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.***, 744 F.3d 1272, 1276-77 (Fed. Cir. 2014) (en banc); ***In re Pacer Tech.***, 338 F.3d 1348, 1349 (Fed. Cir. 2003) ("[t]his court reviews the Board's legal conclusions ***de novo***"). The PTAB's legal conclusions including statutory interpretation are also reviewed ***de novo***. ***Belkin Int'l, Inc. v. Kappos***, 696 F.3d 1379, 1381 (Fed. Cir. 2012); ***City of Arlington v. FCC***, 133 S. Ct. 1863, 1868 (2013) ("the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress").

The PTAB's interpretation of PTO regulations is entitled to substantial deference, unless the interpretation is "plainly erroneous or inconsistent with the regulation." ***In re Garner***, 508 F.3d 1376, 1378 (Fed. Cir. 2007).

Further, the PTAB's determination of obviousness is reviewed ***de novo***, and factual findings are reviewed for substantial evidence. ***In re Gartside***, 203 F.3d

1305, 1316 (Fed. Cir. 2000). The "existence of a reason for a person of ordinary skill to combine references" is a question of fact. *In re Constr. Equip. Co.*, 665 F.3d 1254, 1255 (Fed. Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

### B. The PTAB Erred In Its Construction of "PDA" by Applying The Incorrect BRI Standard.

#### 1. The PTO lacked substantive rulemaking authority to require the application of the BRI standard in IPR proceedings

Congress has not granted the PTO authority to promulgate substantive rules. 35 U.S.C. § 2(b)(2) only permits the PTO to "establish regulations … which … shall govern the <u>conduct</u> of proceedings in the Office…" (emphasis added). Congress' authorization to regulate conduct, which constitutes "the broadest of the Office's rulemaking powers," permits only "procedural" rulemaking. *Cooper Techs. Co. v. Dudas*, 536 F.3d 1330, 1335 (Fed. Cir. 2008); *Tafas v. Doll*, 559 F.3d 1345, 1352 (Fed. Cir. 2009). The BRI standard is a substantive rule, and thus exceeds the PTO's limited procedural rulemaking authority.

In particular, after the institution of the AIA and in connection with IPR proceedings, the PTO promulgated 37 C.F.R. § 42.100(b), which provides that claims "in an unexpired patent shall be given [their] broadest reasonable construction in light of the specification of the patent in which [they] appear." As

such, this regulation has particular substantive outcomes, particularly related to the patentability of claims at issue in an IPR proceeding, but does not merely regulate procedural conduct. ***Cooper***, 536 F.3d at 1335.

This Court has already held that "conduct of proceedings" referred to in § 2 only refers to procedural regulations. ***Id***. In light of this Court's holding, it does not follow that the "conduct of inter partes review" referred to in 35 U.S.C. § 316 refers to substantive regulations, such as the appropriate claim construction standard to be applied in IPR proceedings.[1]

Furthermore, nothing in § 316 suggests that this new section provides the PTO with authority to override ***Phillips v. AHW Corp.***, 415 F.3d 1303, 1312-19 (Fed. Cir. 2005) (en banc), to alter the legal rules governing claim construction in adjudicatory proceedings. Nor does § 316 suggest that the PTO may utilize the BRI standard as an "examination expedient," which is permitted in examinational proceedings. ***In re Skvorecz***, 580 F.3d 1262, 1267 (Fed. Cir. 2009). As the Court explained in ***Skvorecz***, the BRI "protocol is solely an examination expedient, not a rule of claim construction. Its purpose is to facilitate exploring the metes and bounds to which the applicant may be entitled, and thus to aid in sharpening and clarifying the claims during the application stage, when claims are readily changed." ***Id***.

---

[1] On its face, § 316 also does not address or provide the proper claim construction standard for IPR proceedings.

If it was Congress' intent to grant drastically increased rulemaking ability to the PTO, particularly to include substantive regulations regarding claim construction, which affects patentability, Congress could have readily amended § 2(b)(2). However, Congress did not include such an amendment in the AIA, and thus the promulgation of 37 C.F.R. § 42.100(b) is beyond the PTO's rulemaking powers.

### 2. The BRI standard is not appropriate for an IPR proceeding

Under the BRI standard, rather than determining the legally operative scope of the claims based on the principles articulated in *Phillips*, the PTO determines validity based on the so-called broadest reasonable interpretation of the claims.

It is axiomatic that the claims of an issued patent define the invention's metes and bounds. 35 U.S.C. § 112(b). This Court has held that it is the job of the courts to interpret claims and to determine the scope of patented inventions. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Further, claims are construed the same way for both validity and infringement. *Source Search Techs., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1075 (Fed. Cir. 2009).

Under *Phillips*, which enumerates the standard for adjudicatory proceedings such as IPRs, claims are to be given their "ordinary and customary" meaning, which is the "meaning that the term would have to a person of ordinary skill in the

art in question at the time of the invention." 415 F.3d at 1313. As explained above, in examinational proceedings, this Court has permitted the use of the BRI standard. *Skvorecz*, 580 F. 3d at 1267. As this Court explained, the BRI "protocol is used solely as an examination expedient … to aid in sharpening and clarifying the claims during the application stage, <u>when claims are readily changed</u>." *Id*. (emphasis added). Notwithstanding this Court's directive that BRI is "solely an examination expedient," the PTAB improperly extended this standard to the appealed-from IPR proceeding, which is an adjudicatory trial held before administrative judges.

Examination of a patent application and reexamination of an issued patent bear little to no substantive relation to IPR proceedings. Patentees (or applicants) in such examinational proceedings have the right to make "any amendment." *In re Yamamoto*, 740 F. 2d 1569, 1572 (Fed. Cir. 1984). In contrast, patent owners in AIA trials—including IPR proceedings—have no such right or ability. Rather, they are granted only the limited opportunity to "file 1 motion to amend the patent." 35 U.S.C. § 316(d). The standards for granting such a motion are extremely strict, and the PTAB may deny a motion to amend the claims whenever it decides that the patent owner has not met "the burden of proof to establish that it is entitled to the relief requested." 37 C.F.R. § 42.20(c).

Further, to the extent the PTAB permits amendment, it is limited to cancelling claims or substituting one issued claim for one amended claim. 37 C.F.R. § 42.121. This motion-practice procedure—again demonstrating the adjudicatory nature of the new reviews—differs greatly from the right to amend claims in the examinational context, and fails to justify use of the BRI standard.

## C. The PTAB's Construction of "PDA" Is Incorrect under The BRI Standard and *Phillips*.

As explained above, the PTAB erred in its application of the BRI standard for claim construction; the *Phillips* standard should have been applied to construe claim terms and, in particular, the term "PDA." However, even in spite of this error, the construction of "PDA" adopted by the PTAB is incorrect under either the BRI or the *Phillips* standard as being overly-broad and thus unreasonable.

The PTAB construed the term "PDA" as "a substantially hand-sized computer used for storing and manipulating an amount of data and capable of exchanging information with a host." A192-97. MST's primary dispute with the construction adopted by the PTAB is that it is unreasonably broad because it does not require synchronization of data with a host computer, and therefore includes multiple devices that one of ordinary skill in the art would not consider to be PDAs.

This Court reviews the PTO's interpretation of disputed claim language to determine whether it is "reasonable." *In re Morris*, 127 F.3d 1048, 1055 (Fed. Cir.

1997). The Court has held that the BRI standard does not give the PTO (or, by extension in the present case, the PTAB) "an unfettered license to interpret claims to embrace anything remotely related to the claimed invention." *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010).

A reasonable construction of the term PDA is one that describes devices that one of ordinary skill in the art, at the time of invention, would have understood to be PDAs. A construction that excludes from the definition of "PDA" one or more devices that were known to be PDAs is overly-narrow. Conversely, a construction that includes in the definition of "PDA" one or more devices that were known <u>not</u> to be PDAs is overly-broad. Here, the PTAB has adopted a construction that includes devices that were known not to be PDAs, and thus is overly-broad and unreasonable. Further, although MST acknowledges the '880 Patent explains PDAs as being "small, substantially hand-sized computers that are used for storing, manipulating, and retrieving a defined amount of data," A22-34 (1:11-13), this is not an explicit definition or an attempt to act as their own lexicographer, but rather is explanatory text that sets the stage for one example embodiment of a PDA, namely the PalmPilot®, whose features (such as synchronization of data) were well-understood at the time of invention. A2786-88 and 2792.

As set forth in the IPR record, the PTAB's construction of the term "PDA" includes a number of devices, including merely by way of example various TI

graphing calculators, which one of ordinary skill in the art <u>would not</u> understand to be PDAs. A2835-4354 and 4359-60. Indeed, one key distinction between these exemplary graphing calculators and PDAs is that the TI graphing calculators lack personal assistance applications and the ability to synchronize data with a host computer, two hallmark features of PDAs at the time of invention. A2786-88, 2792, and 2835-4354.

MST agrees that the PTAB's construction of the term "PDA" partially characterizes the features of a PDA; however, it is problematic that non-PDA devices also satisfy the PTAB's construction. The PTAB failed to reconcile the inclusion of non-PDA devices in its construction of the term "PDA," despite MST raising the issue on multiple occasions. A414-15, citing A2835-4354; A4359-60; and A17 (PTAB addressing graphing calculator exhibits only as evidence of commercial success, but not for their impact on claim construction).

Because the PTAB's construction of the term "PDA" is overly-broad, and thus unreasonable, for including multiple non-PDA devices,[2] such construction must be overturned.

Further, under ***Phillips***, expert testimony "can help the court determine what a person of ordinary skill in the art would understand claim terms to mean." 415

---

[2] The referenced TI graphing calculators are but one example. MST asserts that one of ordinary skill in the art would readily identify numerous other devices that satisfy the PTAB's construction of "PDA" but that would not be understood to actually be PDAs.

F.3d at 319. However, the PTAB did not give proper weight to Dr. Sidhu's testimony regarding <u>extrinsic</u> evidence, simply because Dr. Sidhu did not cite to the '880 Patent specification for support of this <u>extrinsic</u> evidence. A6-7. Thus, extrinsic evidence, which is appropriate under the correct *Phillips* standard, was not adequately considered. A2782-83, 2786-88, & 2792. For this additional reason, the PTAB's construction must be overturned.

### D. The PTAB Erred in Cancelling Claims 18-20 under §§ 102 and 103.

#### 1. Ruppert and PPT4100 do not disclose all limitations of Claim 18.

As explained above, the PTAB's construction of the term "PDA" was improper as overly-broad, regardless of whether the BRI or *Phillips* standard is applied. Thus, the PTAB's determination that Claims 18-20 were not patentable over the references cited in the adopted rejections was predicated on an improper construction of the recited claim term "PDA;" this determination is necessarily flawed.

In essence, Claims 18-20 were cancelled because Ruppert and PPT4100 were held to contain the features required by the PTAB's overly-broad (and inappropriate as explained above) construction of the term "PDA." However, regardless of the construction of the term PDA, both Ruppert and PPT4100 lack

features that were known by one of ordinary skill in the art at the time of invention to be present in a "PDA," and thus do not disclose a PDA device.

Both at the time of invention (March 9, 1998) and in the years leading up to the invention, one of ordinary skill in the art would have understood the term PDA to refer to a subset of handheld computers that a) include personal assistance applications to manage personal data, as suggested in the name "personal data assistant" or "personal digital assistant"; and b) have the ability to synchronize data from these applications with a host computer. A2786-88. The '880 Patent also notes that the PalmPilot® is one example of such a PDA. A22-34 (1:14-16). Both Ruppert and PPT4100 lack these features and, as would be understood by one of ordinary skill in the art, fail to disclose or suggest "a single embedded PDA design" as required by Claim 18.

Of course, the PTAB does not address whether Ruppert discloses a PDA device under a construction that comports with how one of ordinary skill in the art would understand the term. However, the PTAB did suggest that "[a]pplying Patent Owner's proposed construction of PDA would not alter the outcome." A11. The PTAB's rationale appears to be that because the '880 Patent specification "states that the PDA is conventional," and that Ruppert discloses "the incorporation of the claimed elements into a conventional device," that Ruppert also discloses a PDA. *Id*. Naturally, it does not follow that because a PDA is

conventional, that any conventional device is a PDA. Beyond this conclusory assertion, the PTAB did not address whether Ruppert discloses a PDA under either MST's proffered construction or under a construction that comports with how one of ordinary skill in the art would understand the term "PDA."

Similarly, the PTAB does not address whether PPT4100 discloses a PDA device under a construction that comports with how one of ordinary skill in the art would understand the term. As above, the PTAB did suggest that "[a]pplying Patent Owner's proposed construction of PDA would not alter the outcome." A13. The PTAB applied the same rationale as with respect to Ruppert and, as above, it does not follow that because a PDA is conventional, that any conventional device is a PDA. Beyond this conclusory assertion, the PTAB did not address whether PPT4100 discloses a PDA under either MST's proffered construction or under a construction that comports with how one of ordinary skill in the art would understand the term "PDA."

Thus, the PTAB has incorrectly asserted that either one of Ruppert or PPT4100 discloses or suggests all the limitations of Claim 18, as neither discloses "a single embedded PDA design," when properly construed.

### 2. Neither Ruppert and Dvorkis nor PPT4100 and SE1000 render obvious all limitations of Claim 18.

MST refers to the foregoing, which explains that neither Ruppert nor PPT4100 discloses or suggests "a single embedded PDA design," when the term

"PDA" is properly construed. Further, Dvorkis and SE1000—the references cited in combination with Ruppert and PPT4100, respectively—generally disclose scan modules or scan engines to be used, for example, for bar code scanning. However, these references contain minimal disclosure regarding communication with a host computer, and also fail to teach or suggest that the scan modules or scan engines may be integrated into a single embedded PDA design configured to exchange and synchronize information with a host computer. A2794-96.

Because none of the cited references discloses or fairly suggests "a single embedded PDA design" when correctly interpreted, *prima facie* obviousness cannot be established based on the references cited in the adopted rejections. Thus, all that remains are Motorola's claims that: 1) it would be obvious to include synchronization to a conventional bar code scanner, such as the PPT 4100, or 2) it would be obvious to add a laser scan engine to a conventional PDA.

At the time of the invention, conventional bar code scanners functioned only as data <u>collection</u> devices, where data is collected from a bar code at the scanning site and later downloaded to a host computer. Even in Ruppert, where two-way data flow occurs between the scanner and a host computer, the data is not "synchronized" such that the same data exists on both the host and the scanner. A1527-49 (Abstract; 1:67-2:26; and 2:7-11 and 35-42); *see also* A344-45. There would be no reason to modify the prior art scanners to include synchronization,

because those scanners were merely utilized to collect data represented in a bar code and transfer that data to a host, and synchronizing data with a host computer does not improve performance of data collection or subsequent performance uploading to the host computer.

At the time of the invention, conventional PDA devices functioned as adjuncts to computers for synchronizing personal information management applications (*e.g.*, to do lists and address books). Such information is rarely, if ever, stored in bar code form, and thus it would not have been obvious to one of ordinary skill in the art incorporate a laser scan engine to a conventional PDA, since it would add unnecessary cost to the PDA and provide no additional benefit to the user of the PDA.

Finally, MST notes that the PTAB did not address the applicability of the combination of PPT4100 and SE1000 under MST's proposed construction of the term "PDA." A16-17. However, the result would be the same as above since, as explained, ***prima facie*** obviousness cannot be established based on the references cited in the adopted rejections, and it would not be otherwise obvious to combine known features in the art to arrive at the invention of Claim 18 of the '880 Patent.

Thus, the PTAB has incorrectly asserted that either the combination of Ruppert and Dvorkis or PPT4100 and SE1000 renders obvious all the limitations

of Claim 18, and failed to address whether any of the references disclosed "a single embedded PDA design," when properly construed.

**E.**   **The PTAB Erred in Determining MST's Proposed Amended Claims Failed The Written Description Requirement and Did Not Add Patentable Subject Matter.**

MST sought to amend Claim 18, recast as Claim 21, to explicitly recite the synchronization feature, which was known by one skilled in the art to be present in PDAs. A337-49. Such an amendment was intended to prevent an overly-broad and unreasonable construction of the term "PDA." As MST noted, the "written description" requirement implements the principle that a patent must describe the technology that is sought to be patented. *Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005). This requirement helps satisfy the obligation to disclose the knowledge upon which the patent is based, and also demonstrates that the patentee possessed the claimed invention. *Id*. Although not addressed by the PTAB, MST notes that there is no *in haec verba* requirement and that it is sufficient that limitations be supported through implicit or inherent disclosure. A415-16, citing MPEP § 2163(I)(B)).

In the present case, one of ordinary skill in the art would have understood that these proposed amendments referred to features present in PDAs (of which the PalmPilot® is but one example), and thus would also have understood that MST possessed the invention sought to be claimed in the proposed substitute claims.

The PTAB also denied MST's motion to amend for not adding patentable subject matter based on a supposed comparison of the feature sought to be required by the proposed substitute claims. However, the PTAB failed to actually address the proposed amended features; rather, the PTAB only addressed the features of original Claim 18 relative to the cited references.[3]

As noted above in Section V(D)(1), the PTAB's rationale for why MST's proposed construction would not alter the determination of unpatentability was flawed. The PTAB noted that the '880 Patent specification "states that the PDA is conventional," and that Ruppert and PPT4100 disclose "the incorporation of the claimed elements into a conventional device." A11, 13. However, it does not follow that because a PDA is conventional, that any conventional device is a PDA. Regardless, the PTAB did not at all address whether Ruppert and PPT4100 disclose synchronization of data as required by proposed substitute Claim 21.

Accordingly, it was error to determine that substitute Claim 21 failed the written description requirement. It was also error to determine that Claim 21 did not add patentable subject matter where no analysis of the actual amended claim limitation of Claim 21 was undertaken.

---

[3] Indeed, the bulk of the PTAB reasoning is that "as discussed above, even importing such a limitation into the claims, the claims are unpatentable." A19.

## VI.   CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Appellant respectfully requests that this Court reverse the PTAB's final written decision cancelling Claims 18-20. Alternatively, Appellant respectfully requests that this Court reverse and remand for reconsideration of MST's motion to amend the claims based on the correct interpretation of "PDA," and under the appropriate claim construction standard.

Respectfully submitted,

/s/Charles J. Rogers
Charles J. Rogers
Conley Rose, P.C.
1001 McKinney Street, Suite 1800
Houston, TX  77002-6421
Telephone: (713) 238-8049
Facsimile: (713) 238-8008
E-mail: CRogers@conleyrose.com

Principal Attorney for
Patent Owner-Appellant
Mobile Scanning Technologies, LLC

**ADDENDUM**

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

MOTOROLA SOLUTIONS, INC.
Petitioner

v.

MOBILE SCANNING TECHNOLOGIES, LLC
Patent Owner
_____

Case IPR2013-00093
Patent 6,065,880
_____

Before, GLENN J. PERRY, BRIAN J. McNAMARA and
MITCHELL G. WEATHERLY, *Administrative Patent Judges*.


McNAMARA, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and*
*37C.F.R. § 42.73*

BACKGROUND

Motorola Solutions, Inc. ("Petitioner") filed a petition for *inter partes* review (Paper 9, "Petition") of claims 18-20 of U.S. Patent No. 6,065,880 ("the '880 Patent") owned by Mobile Scanning Technologies LLC ("Patent Owner").

In a Decision to Institute entered on April 29, 2013 (Paper 28), we instituted a trial on the following grounds under 35 U.S.C. § 102:

Claim 18 as anticipated by Ruppert[1];

Claim 18 as anticipated by PPT4100 System Administration Manual[2]; and

Claim 20 as anticipated by PPT4100 System Administration Manual.

We also instituted a trial on the following grounds under 35 U.S.C. § 103:

Claims 18, 19 and 20 as unpatentable over the combination of Ruppert and Dvorkis[3]; and

Claims 18, 19 and 20 as unpatentable over the combination of the PPT4100 System Administration Manual and the SE1000 Series Integration Guide[4].

In this Final Written Decision, we hold that claims 18, 19 and 20 of the '880 Patent are unpatentable.

THE '880 PATENT

The '880 Patent describes an adapter electrically coupled to a personal data assistant (PDA).  (Ex.1001, Abstract).  The adapter includes a laser or other light

---

[1] U.S. Patent No. 5,424,524 (Ex. 1019).

[2] PPT4100/4110 System Administration Manual, Rev. A, Symbol Technologies, Inc., May, 1994 (Ex. 1011).

[3] U.S. Patent No. 5,552,592 (Ex. 1024).

[4] SE1000 Series Scan Engine Family Specification, Symbol Technologies, Inc., 1994 http://web.archive.org/web/19980615025136/http://www.symbol.com/STooooo70.HTM (Ex. 1006).

source which emits a light beam that can be modified into a digital signal to download information to a PDA equipped with a photo detector or to be used as a presentation pointer. Ex. 1001, Abstract. The adapter also includes a photo detector positioned so that light from the laser can be reflected from a bar code, received by the photo detector, and converted to a digital signal, which is then forwarded to the PDA. *Id.* Electronic components of the adapter can be integrally incorporated into the PDA, so as to eliminate the need for the adapter. *Id.* at col. 2, ll. 22-24. A single embedded PDA design is the subject of the challenged claims. The PDA is conventional. *Id.* at col. 2, ll. 60-61.

## ILLUSTRATIVE CLAIMS

Claim 18 of the '880 patent, which was amended as indicated in an *ex parte* reexamination certificate issued under 35 U.S.C. § 307, is illustrative of the subject matter at issue in this proceeding.

18. A PDA comprising:
a single embedded PDA design comprising:
(a) a housing having a front face extending between a top end and an opposing bottom end, a display screen is positioned on the front face and an interface connector is positioned at the bottom end,
(b) a micro controller is disposed within the housing and is electrically coupled to the connector;
(c) a laser is disposed within the housing and is configured to emit a light beam through the top end of the housing;
(d) an analog to digital converter is disposed within the housing and is electrically coupled with the micro controller
(e) a photo detector is positioned at the top end of the housing and is configured to receive reflected light from the laser.

Claim 19, which depends from claim 18, recites that the PDA further comprises means for converting light from the laser into a digital signal. Claim 19 does not recite whether this means is for transmitted light or received light.

3

Claim 20, which also depends from claim 18, recites that "the laser emits a visible red light that is sufficiently collimated to function as a pointer."

CLAIM CONSTRUCTION

As discussed further herein, a significant issue raised by the parties in this case concerns the construction of the term "personal data assistant" (PDA). We extensively addressed the construction of PDA in our Decision to Institute at pages 6-11. For the reasons discussed therein, we construed PDA to mean *a substantially hand-sized computer used for storing and manipulating an amount of data and capable of exchanging information with a host. Id.* at 11. Patent Owner advocates a different construction, i.e., one that includes a synchronization functionality. *See* PO Resp. 6-12.

In *inter partes* review, a claim of an unexpired patent is given its broadest reasonable construction consistent with the specification of the patent in which it appears. 37 C.F.R. § 41.100(b).

The specification of the '880 Patent states:

> Personal data assistants (hereinafter "PDAs") are small, substantially hand-sized computers that are used for storing, manipulating, and retrieving a defined amount of data.

Ex. 1001, col. 1, ll. 11-13.

The specification identifies "[o]ne example of a PDA is the PalmPilot®," which is manufactured by 3Com and functions primarily as an electronic day planner and address recorder. *Id.* at col. 1, ll. 13-16. Patent Owner's expert, Dr. Ikhlaq Sidhu, testified that the '880 Patent "doesn't go into specifics of what a PDA is[,] except possibly to indicate that the PalmPilot PDA is . . . an example of a PDA." Ex. 1047, 175.

The specification states that a shortcoming of PDAs is that the process for transferring data between a PDA and a personal or network computer requires physically, electrically coupling a cradle to the host computer and physically, electrically coupling the PDA to the cradle, so that software in the host can access the PDA to download or upload information between the host and the PDA.  Ex. 1001, col. 1, ll. 17-24.  Thus, one object of the invention is to download information quickly and easily to a host without physically, electrically coupling the PDA to the host.  *Id.* col. 1, ll. 39-43.  According to the '880 Patent, another shortcoming of PDAs is the difficulty of manually inputting data into devices that lack a keyboard.  *Id.* at col. 1, ll. 29-35.  Thus, a second objective is to provide a PDA with an adapter that can be used to load data quickly into the PDA.  *Id.* col. 1, ll. 44-47.  The "inventive adapter," *id.* at col. 2, ll. 60-61, whose electronics can be integrally incorporated with a PDA, is a bar code scanner structure, as described above in our discussion of the '880 Patent.

The preamble of the claims is drawn to a PDA.  The claim limitations recite only a single embedded PDA design.[5]  The claimed design comprises specific hardware elements, i.e., a housing, a microcontroller, a laser, an analog-to-digital converter, and a photo-detector.

Patent Owner contends that "the '880 Patent does not suggest that all hand-sized computers are PDAs, nor does it suggest that the term PDA, as used in the claims, should not be interpreted as including other aspects of PDAs known to those of skill in the art."  PO Resp. 10.  Notwithstanding the description of PDA given in the specification cited above, Patent Owner argues that the function of

---

[5] We have construed "single embedded PDA design" to mean that all the components of the claim are integrated within a single device.  Dec. to Institute, 13-14.

recording personal information, such as day planner and address book information, as performed by the exemplary PalmPilot®, requires that the claim be construed to include the ability to synchronize data with a host computer. *Id.* at 8. Patent Owner notes that our Decision to Institute referenced the Pilot Handbook, published by U.S. Robotics, a predecessor of 3Com, which states that one can use a desktop computer to synchronize and back-up the data stored in one's Pilot, or to transfer data into the Pilot from other sources such as a database application. PO Resp. 11, s*ee,* Ex. 1026, 8. It is not clear from this text how "synchronize" differs from "back up." In addition, transferring data from a database to a Pilot is not synchronization of the Pilot and the database.

Citing the testimony of its expert, Dr. Sidhu, Ex. 3014 ¶14, Patent Owner further states that:

> Synchronization in the context of a PDA and host computer means that as a system, the PDA and the host computer each keep a copy of data stored by certain applications running on the PDA; that is, the same data is also stored by parallel applications on the host computer when synchronization occurs.

PO Resp. 8. Dr. Sidhu testifies that, in contrast to a day planner, which is a paper version of a PDA, maintaining on a host computer a copy of the data entered on a PDA avoids losing information when the PDA is lost or damaged, and allows information to be entered either at the PDA or the host. PO Resp. 8-9, Ex. 1034 ¶13.

It is noteworthy that neither Patent Owner nor Dr. Sidhu cites to any disclosure in the '880 Patent specification supporting the importation of a synchronization function into the claims or to any support for Patent Owner's proposed definition of synchronization. *See,* Ex. 1047, 175, 177. Claim 18

includes the term PDA in its preamble, but limits the claimed subject matter to a PDA comprising a single embedded PDA design incorporating specific physical elements. Claim 18 does not recite the functionality described by Patent Owner and Dr. Sidhu, nor does the '880 Patent specification discuss such functionality as an element of PDA design.

Patent Owner does not address how the ability to back-up PDA data on a host computer or the ability to transfer data from a host to a PDA requires synchronization. Patent Owner argues that allowing a data set to be kept common between the host computer and a PDA, regardless of which data set is changed first, conforms to Webster's definition of "synchronizing," i.e., "1: to represent or arrange (events) to indicate coincidence or coexistence." PO Resp. 9. Events, or in this case data, that are synchronous occur coincidently or coexist. There is no requirement in the definition of synchronous that the data in two devices be identical. Devices are synchronized when they perform tasks or contain data simultaneously or in a fixed time relationship, even if those devices contain different data. Claim 18 recites a design that incorporates physical elements, but recites no functional limitations on the PDA and no events or data that are coincident or coexist. The Patent Owner does not identify any description in the '880 Patent of events or data that are coincident or coexist.

Dr. Sidhu's explanation of synchronization merely states that the PDA and the host computer keep a copy of data stored by certain applications running on the PDA when synchronization occurs. PO Resp. 8, Ex. 1034 ¶14. Dr. Sidhu's proposed definition does not state whether the host computer keeps a copy of all the data stored by a particular application running on the PDA, which applications constitute the "certain applications" in his proposed definition, when

synchronization occurs, or how synchronization is implemented. The '880 Patent contains no disclosure concerning such synchronization issues.

Dr. Sidhu also testified that the '880 Patent does not describe how synchronization happens in a PDA and that the purpose of the '880 Patent is to describe another invention that is related to a PDA. Ex. 1047, 177. As previously discussed, the '880 Patent specification states that the objective of the "inventive adapter" is to ease inputting data to a PDA, e.g., by reading a bar code, and to improve transferring data to a host. The '880 Patent does not describe the content of that data, or state that any data in the PDA and the host must be the same at any particular time.

In consideration of the above, we are not persuaded that the presence of the term PDA requires that we construe the claims to include a synchronization functionality that is neither claimed nor described in the '880 Patent.

Patent Owner also argues that the term PDA should be limited further to synchronizing data from a "personal assistance application." PO Resp. 12. Although Patent Owner does not define "personal assistance application," Patent Owner argues that the term involves storing "personal information." *Id.* at 18. We understand Patent Owner's argument to be that personal information means day planer and address information stored by the PalmPilot.® The claims of the '880 Patent recite a PDA, are not limited to a PalmPilot, and do not recite any particular data. Particular embodiments in the written description will not be used to limit claim language that has broader effect. *Electro Sci. Indus., Inc. v. Dynamic Details, Inc.,* 307 F. 3d 1343, 1349 (Fed. Cir. 2002).

The '880 Patent contradicts Patent Owner's proposed limited construction. The '880 Patent states:

> As a result of being able to scan bar code readings into the PDA, the functionality of the PDA is substantially increased. For example, the PDA can now effectively be used for monitoring and controlling inventory or other products on which bar codes can be positioned.

Ex. 1001, col. 2, ll. 17-21.

In light of the above, PDA, as used in the claims of the '880 Patent, is not limited to a device that runs a personal assistance application or stores personal information.

Notwithstanding the disclosed inventory monitoring function, Patent Owner argues that there is no requirement in the definition of PDA that inventory data be synchronized with a host computer. PO Resp. 17. We agree. The '880 Patent specifically states that depending upon the intended use and operational software, the PDA can simply store the bar code reading. Ex. 1001, col. 5, ll. 1-8. Thus, PDA, as used in the '880 Patent, is not limited to devices that run personal applications or synchronize data with a host computer.

In view of Patent Owner's position that the disclosed functions of monitoring and controlling inventory by a PDA do not require synchronization, the absence of any disclosure concerning synchronizing data in address and day planner applications, and the absence of any limitation concerning synchronization in the claims of the '880 Patent, we do not limit the claimed PDA to one that synchronizes personal information with a host computer.

As discussed at pages 6-11 of our Decision to Institute, we construe PDA to mean *a substantially hand-sized computer used for storing and manipulating an amount of data and capable of exchanging information with a host.*

9

ANALYSIS OF PRIOR ART CHALLENGES

*Challenges Under 35 U.S.C. § 102*

Claim 18 as Anticipated by Ruppert

Our Decision to Institute addresses anticipation of claim 18 at pages 23-25. In that decision, we determined that Ruppert discloses a personal scanning device that comprises a bar code scanner coupled to a specially programmed digital computer that can use the output of the bar code reader. Ex. 1019, col. 4, ll. 34-39. Ruppert's personal scanner has a display screen 12 on a front face of the housing and a communications port 40 on the bottom, *id.,* Fig. 1, as recited in element (a) of claim 18. Within the housing, Ruppert discloses in Figure 3 that barcode scanner 46 is connected to microprocessor 40, which also is connected to a serial or parallel bi-directional data communications interface and port 85. *Id.* at col. 8, ll. 21-28. We have construed the microcontroller recited in claim 18 to include a microprocessor. Ruppert discloses that the microprocessor is electrically coupled to the interface connector, as recited in element (b) of claim 18. As recited in element (c) of claim 18, Ruppert is configured to emit a light beam, including a laser light beam, through scan window 18 at the top end of the housing. *Id.* at col. 5, ll. 44-55, Fig. 1. We also have determined that Ruppert inherently discloses an analog-to-digital converter electrically coupled to a photo-detector, as recited in elements (d) and (e) of claim 18. Dec. to Institute 25.

The Patent Owner Response does not dispute any of these findings. PO Resp. 12-14. Patent Owner argues that Ruppert does not anticipate claim 18 because, in failing to disclose that any data is synchronized between the personal bar code scanner and a host computer, Ruppert does not disclose a single embedded design having certain characteristics of a PDA. *Id.* at 5, 14. As we discussed above, claim 18 is drawn to a design that includes the above-described

10

structural elements. Claim 18 does not recite a synchronization functionality or a particular personal assistance application program, nor does the '880 Patent describe a synchronization functionality as an element of a PDA. Having determined that each of the structural elements recited in claim 18 is disclosed in Ruppert, we find that Petitioner has demonstrated by a preponderance of the evidence that Ruppert anticipates claim 18.

Applying Patent Owner's proposed construction of PDA would not alter the outcome.[6] The specification states that the PDA is conventional. Ex. 1001, col. 2, ll. 60-61. The structure recited in claim 18 does not impose any limitation on the functions performed by this admittedly conventional device. As discussed above, Ruppert discloses the incorporation of the claimed elements into a conventional device. Thus, even under Patent Owner's construction, the preponderance of the evidence demonstrates that claim 18 is anticipated by Ruppert.

Claim 18 Anticipated by PPT 4100 System Administration Manual

Our Decision to Institute, at pages 28-29, addressed anticipation by the PPT4100 System Administration Manual. The PPT4100 System Administration Manual discloses a hand-held computer, Ex. 1011, 1-1, that stores and manipulates an amount of data, id. 1-8, 3-1, and is capable of exchanging information with a host, id. at 1-1, 1-8, 3-1. The PPT4100 is a single embedded PDA design because the PPT 4100 System Administration Manual discloses all these features in an integrated apparatus.

As recited in element (a) of claim 18, the PPT4100 has a housing with a front face with display screen 4, a top end with scanner window 9 and an opposing

---

[6] We reach this issue because Patent Owner's Contingent Motion to Amend, as discussed further herein, proposes a substitute claim that recites explicitly the synchronization feature Patent Owner contends is inherent in the term PDA.

11

bottom end where serial communications port 20 is located. *Id*. at 1-5, 1-6. The PPT4100 also has a microcontroller in the form of a CPU, *id.* at 3-6. The specification for the PPT4100 identifies the CPU as a PC-chip F8680A. Ex. 1012, 2. Software can be loaded into the PPT4100 to allow the terminal to run applications from an SRAM card. Ex. 1011, 3-1, 3-14. Among the applications is a DATA I/O driver. *Id.* at 3-13. Thus, we agree with Petitioner that the PPT4100 discloses a microcontroller electrically coupled to the interface connector, as recited in element (b) of claim 18.

The PPT4100 System Administration Manual shows that the PPT4100 incorporates an integrated bar code scanner, Ex. 1011, 4-4, 4-5, which emits light through the scanning window, thus disclosing a laser disposed within the housing to emit a light beam from a top end of the housing, as recited in element (c) of claim 18.

The PPT4100 specification sheet indicates that the PPT4100 incorporates the SE1000 scanning engine, which would include a photo-detector to receive light reflected from the bar code and an analog-to-digital converter to process the signal. *See* Dec. to Institute 29.

The Patent Owner does not dispute our findings concerning the structure of the PPT4100 as disclosed in the PPT System Administration Manual. PO Resp. 14-15. Patent Owner agrees that the PPT4100 discloses a data collection device to collect information from bar codes and transmit various information, including the bar code information, to a host computer. PO Resp. 5. However, Patent Owner argues that the PPT4100 System Administration Manual does not anticipate claim 18 because, in failing to disclose data is synchronized between the personal bar code scanner and a host computer, the reference fails to disclose a single embedded design with the characteristics of a PDA. *Id.* at 5, 14. As we discussed above,

12

claim 18 is drawn to a design that includes the above-described structural elements. Claim 18 does not recite a synchronization functionality or any particular personal assistance application program or data, nor does the '880 Patent describe a synchronization functionality as an element of a PDA. Having determined that the PPT4100 System Administration Manual discloses each of the structural elements recited in claim 18, we conclude that Petitioner has demonstrated by a preponderance of the evidence that the PPT4100 System Administration Manual anticipates claim 18.

Applying Patent Owner's proposed construction of PDA would not alter the outcome.[7] The specification states that the PDA is conventional. Ex. 1001, col. 2, ll. 60-61. The structure recited in claim 18 does not limit the functions performed by this admittedly conventional device. As discussed above, the PPT4100 System Administration manual discloses the incorporation of the claimed elements into a conventional device. Thus, even under Patent Owner's construction, the preponderance of the evidence demonstrates that Ruppert anticipates claim 18.

<u>Claim 20 as Anticipated by the PPT4100 System Administration Manual</u>

Claim 20 depends from claim 18 and recites that the laser emits a visible red light sufficiently collimated to function as a pointer. Claim 20 limits only the characteristics of the laser and does not recite that the PDA, itself, functions as a pointer. The PPT4100 specification sheet discloses that the built-in SE1000 scanner uses a 675nm laser diode, Ex. 1012, 2-4, which, as noted in the declaration of Petitioner's expert Dr. David Allais ("Allais Decl."), is in the red color range. Ex. 1002, ¶ 0073. Therefore, the claimed collimated visible red laser is necessarily

---

[7] We reach this issue because Patent Owner's Contingent Motion to Amend, as discussed further herein, proposes a substitute claim that recites explicitly the synchronization feature Patent Owner contends is inherent in the term PDA.

present, and hence inherent, in the PPT4100.  *See Akamai Techs., Inc. v. Cable & Wireless*, 344 F.3d 1186, 1192 (Fed. Cir. 2003); *Rosco, Inc. v. Mirror Lite Co.,* 304 F. 3d 1373, 1380 (Fed. Cir. 2002).

Patent Owner repeats the arguments it asserted with respect to claim 18, but does not provide any other evidence that claim 20 is patentably distinguished from the PPT4100 System Maintenance Manual.  As discussed above, however, Petitioner has demonstrated by a preponderance of the evidence that the PPT4100 System Administration Manual anticipates claim 18.  We conclude that Petitioner has shown by a preponderance of the evidence that the PPT4100 System Administration Manual anticipates claim 20.  For the reason discussed above with respect to claim 18, we would reach the same conclusion applying Patent Owner's proposed construction of PDA.[8]

*Challenges Under 35 U.S.C. § 103*

Claims 18, 19 and 20 as unpatentable over the combination of Ruppert and Dvorkis

In this decision, we previously discussed the disclosure provided by Ruppert.  Our Decision to Institute notes that Dvorkis,  Exhibit 1024, discloses a prior art scanner in a housing with a laser light source, a detector producing an analog signal proportional to the intensity of reflected light, and a microprocessor and associated memory to digitize the analog signal. Dec. to Institute 26-27. Patent Owner does not dispute that Dvorkis discloses these elements of claim 18 or claim 20.  PO Resp. 19.  Patent Owner also does not dispute that the structure corresponding to the means for converting light from the laser to a digital signal

---

[8] We reach this issue because Patent Owner's Contingent Motion to Amend, as discussed further herein, proposes a substitute claim that recites explicitly the synchronization feature Patent Owner contends is inherent in the term PDA.

recited in claim 19, which we discussed in our Decision to Institute at pages 31-33, is disclosed by Dvorkis. *Id.* Patent Owner argues that Petitioner has failed to establish that the references disclose the characteristics of a PDA, i.e., a personal assistance application and the ability to synchronize data with a host computer, or that the inclusion of a synchronization feature would have been obvious to one of ordinary skill in the art. *Id.*

As we have discussed previously, claims 18, 19, and 20 are not limited to performing a synchronization function, nor does the '880 Patent disclose such a feature, as Patent Owner argues distinguishes the claims over Ruppert and Dvorkis. PO Resp. 19-20. For this reason, we conclude that the preponderance of the evidence demonstrates that claims 18-20 would have been obvious over the combination of Ruppert and Dvorkis.

We would reach the same conclusion, even under Patent Owner's proposed construction of PDA.[9] Ruppert discloses a personal scanning device, i.e., one used by a shopper, who, upon entering a store, downloads a price list from a store's computer, Ex. 1019, col. 6, ll. 1-18; col. 8, ll. 21-35, scans items into the device while shopping, and checks out by transferring the scanned information to the store's computer. *Id.* at col. 3, ll. 43, 47; Fig, 5; col. 9, ll. 54-61; col. 11, ll. 11-26. Even under Patent Owner's construction, Ruppert discloses that it would have been obvious for a PDA with the claimed structure to run a personal application that synchronizes its data to a host computer. Thus, even applying Patent Owner's construction to the claims, we conclude that the claims 18-20 would have been obvious over the combination of Ruppert and Dvorkis.

---

[9] We reach this issue because Patent Owner's Contingent Motion to Amend, as discussed further herein, proposes a substitute claim that recites explicitly the synchronization feature Patent Owner contends is inherent in the term PDA.

Claims 18, 19 and 20 as unpatentable over the combination of the PPT4100
System Administration Manual and the SE1000 Series Integration Guide

We discussed the disclosure in the PPT4100 System Administration Manual
in an earlier section of this decision. Our Decision to Institute details the
disclosure concerning scan engine implementation in the SE 1000 Series
Integration Guide. Dec. to Institute 29-30. Patent Owner does not dispute that
SE1000 Series Integration Guide discloses the corresponding claim elements. PO
Resp. 16-18.

Patent Owner argues that the handheld computer in PPT4100 lacks PDA
characteristics because it fails to teach a personal assistance application and the
ability to synchronize. *Id.* Patent Owner also argues that Petitioner has failed to
provide evidence that it would have been obvious to incorporate synchronization of
data between a PDA and a host computer. Patent Owner argues that there would
be no reason to include data synchronization capability in the PPT4100 device (or
the device disclosed by Ruppert) because these devices do not store personal
information. PO Resp. 18.

As previously discussed, the claims of the '880 Patent are not limited to
PDAs that store personal information. The claims also are not limited to
circumstances in which data is synchronized. Ex. 1001, col. 2, ll. 5-21. The
specification identifies inventory monitoring and control as one function of a PDA
design incorporating the claimed physical elements. In the context of inventory
control, the '880 Patent specification describes a PDA with an integrated bar code
scanner that can be used simply to store the bar code information. *Id.* at col. 5, l. 1-
8. For these reasons, we conclude that the preponderance of the evidence
demonstrates that claims 18-20 would have been obvious over the combination of

16

the PPT1000 Systems Administration Manual and the SE 1000 Series Integration Guide.

Objective Indicia of Non-Obviousness

Objective criteria constitute independent evidence of non-obviousness. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1378 (Fed. Cir. 2012). Patent Owner argues that Petitioner's Enterprise Mobility Division enjoyed net sales of nearly three billion USD in 2013 and, since its failed alliance with 3Com, Petitioner and the acquired Symbol Technologies company have generated an estimated 25 billion USD in sales. PO Resp. 22-23. Where the patent is said to cover a feature or component of a product, the patent owner has the burden of showing that the commercial success derives from the feature. *Tokai Corp., v. Easton Enters.*, 632 F. 3d 1358, 1369 (Fed. Cir. 2011). Where that feature is found in the product of another, there must be proof that the feature falls within the claims. *E.g.*, *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (infringer's counsel stated at trial that the patent had been copied); *Hughes Tool Co. v. Dresser Indus., Inc.*, 816 F.2d 1549, 1552 (Fed. Cir. 1987) (patented O-ring seal copied by defendant). Patent Owner has provided as Exhibits 3016-3019 documentation concerning certain graphics calculators. However, Patent Owner has made no showing of any nexus between these graphics calculator products and Petitioner's sales and, more importantly, no nexus between Petitioner's sales, the graphics calculators, and the subject matter recited in the claims.

Considering all the evidence, including the objective indicia cited by Patent Owner, we conclude that the preponderance of the evidence demonstrates that claims 18-20 would have been obvious.

MOTION TO AMEND

Having determined that claims 18-20 of the '880 Patent are unpatentable, we consider Patent Owner's Contingent Motion to Amend (Paper 44, "Motion to Amend"). Patent Owner's proposed substitute claim 21 seeks to amend claim 18 by reciting that the single embedded PDA design is "configured to exchange and synchronize data with a host computer." As support for this amendment, Patent Owner cites original U.S. Appl. Ser. No. 09/036,851 (Exhibit 3015, "the '851 application"), which matured into the '088 Patent. Patent Owner notes that page 6, lines 3-4 of the '851 application states "[i]n one embodiment of the present invention, PDA 12 includes a PalmPilot® made by 3Com." Motion to Amend 4. According to Patent Owner, "[a]t the time the application was filed, one skilled in the art would have appreciated that PalmPilot devices had the capability to synchronize, exchange and back up data with a host computer (e.g., using the HotSync feature of a PalmPilot device)." *Id.*

We deny Patent Owner's Motion to Amend. Although the '851 application identifies the PalmPilot as one embodiment of a PDA, the claim is drawn more generally to a "single embedded PDA design" rather than to a PalmPilot. The language cited by Patent Owner states only that in one embodiment of the invention the PDA includes a PalmPilot. The written description does not state that there is only one embodiment. The written description does not state that, even in the one embodiment referenced, the PDA is a PalmPilot. Instead, the specification states that PDA includes a PalmPilot.

Patent Owner has identified no written description of the claimed PDA performing a synchronization function. Patent Owner's expert, Dr. Ikhlaq Sidhu, testified that the '880 Patent does not go into specifics of what a PDA is, except to indicate that the PalmPilot is an example of a PDA. Ex. 1047, 175. Dr. Sidhu also

18

testified that the specification of the '880 Patent does not include a writing stating that synchronization is a necessary feature of a PDA, or a description of how such synchronization would be implemented. *Id.* at 176-177.

Patent Owner argued at the oral hearing that, in specifying synching, its proposed amendment simply clarifies what Patent Owner believes is an inherent feature of a PDA. Tr. 66. However, Patent Owner's importation of a synchronization function into the claimed PDA is inconsistent with the description at page 9, lines 19-23, of the '851 application, which states:

> By using the above configuration, bar codes can be quickly entered into PDA 12 without having to manually input the information. Depending on the intended use and operational software, PDA 12 can either *simply store the bar code reading* or can be used to access other information based on the bar code reading. By using adapter 10, PDA 12 can be used for inventory control or in other situations where bar codes can be used.

Ex. 3015, 9 (emphasis added).

Thus, synchronization is not necessarily inherent in a PDA, as that term is used in the specification of the '880 Patent. In the absence of a specific description limiting the claimed PDA to one "configured to exchange and synchronize data with a host computer," the above description of a PDA in the specification does not support Patent Owner's proposal to limit claim 18 in this way. In consideration of the above, we deny the Motion to Amend as not supported by the written description.

We also deny the Motion to Amend on the basis that it does not add patentable subject matter. Patent Owner argued that the claims should be construed to incorporate the proposed limitation. However, as discussed above, even importing such a limitation into the claims, the claims are unpatentable.

19

When presented with the question of why, in view of the integration of bar code scanners with other conventional devices, it would not have been obvious to integrate a scanner with a PDA, Patent Owner argued long felt need. Tr. 74. However, Patent Owner admitted that the record did not include evidence of such long felt need. *Id.* at 74-75.

In view of these circumstances, Patent Owner's Motion to Amend is denied.

CONCLUSION

This is a final written decision of the Board under 35 U.S.C. § 318(a) and 37 C.F.R. §42.73. We hold that Petitioner has shown by a preponderance of the evidence that claims 18, 19, and 20 of the '880 Patent are unpatentable. Specifically, we hold that Petitioner has shown by a preponderance of the evidence that claim 18 is anticipated under 35 U.S.C. § 102 by Ruppert and that claims 18 and 20 are anticipated by the PPT4100 Systems Administration Manual. We further hold that Petitioner has shown by a preponderance of the evidence that claims 18, 19, and 20 are unpatentable under 35 U.S.C. § 103(a) over the combination of Ruppert and Dvorkis and over the combination of the PPT4100 Systems Administration Manual and the SE1000 Series Integration Guide.

ORDER

In consideration of the above, it is

ORDERED that claims, 18, 19, and 20 of the '088 Patent are unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Amend is DENIED; and,

20

FURTHER ORDERED, that because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

Mitchell S. Feller
Sobel & Feller LLP
msfeller@sobelfeller.com

Aaron Bernstein
Motorola Solutions
aaron.bernstein@motorolasolutions.com

For PATENT OWNER:

Charles J. Rogers
Conley Rose, P.C.
CRogers@conleyrose.com

Paul M. Schwartz
Mobile Scanning Technologies
pschwartz@mobile-st.com



US006065880A

# United States Patent [19]

## Thompson

[11] **Patent Number:** 6,065,880

[45] **Date of Patent:** May 23, 2000

[54] **LASER ENHANCED PERSONAL DATA ASSISTANT**

[75] Inventor: **Curtis Thompson**, Salt Lake City, Utah

[73] Assignee: **3Com Corporation**, Santa Clara, Calif.

[21] Appl. No.: **09/036,851**

[22] Filed: **Mar. 9, 1998**

[51] **Int. Cl.**[7] ...................................................... **G06F 13/00**
[52] **U.S. Cl.** ............................... **385/88**; 235/454; 710/72
[58] **Field of Search** .......................... 385/88, 89, 92–94;
372/109; 235/462, 472, 454; 710/62, 63,
72–74

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,664,231 | 9/1997 | Postman et al. | 710/73 |
| 5,671,374 | 9/1997 | Postman et al. | 710/129 |
| 5,675,524 | 10/1997 | Bernard | 708/109 |
| 5,778,256 | 7/1998 | Darbee | 710/72 |

*Primary Examiner*—John D. Lee
*Attorney, Agent, or Firm*—Workman, Nydegger & Seeley

[57] **ABSTRACT**

An adapter having an L-shaped housing is configured for removable attachment to a conventional PDA. The adapter is electrically coupled with the PDA and includes a laser or other light source configured to selectively emanate a light beam that can be modified into a digital signal. The digital signal can be received by a photo detector on a computer for facilitating a download of data from the PDA to the computer. The light beam from the laser can also be used as a presentation pointer. The adapter further includes a photo detector which is selectively positioned relative to the laser so that the light beam from the laser can be reflected off a bar code and received by the photo detector. The reflected signal is then converted to a digital signal which is then forwarded to the PDA for storage or access of other corresponding information.

**20 Claims, 5 Drawing Sheets**





FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5

1

## LASER ENHANCED PERSONAL DATA ASSISTANT

### BACKGROUND OF THE INVENTION

1. The Field of the Invention

The present invention relates to personal data assistants (PDAs) and, more specifically, PDAs or adapters therefor with enhanced data transmission and receiving capabilities.

2. Present State of the Art

Personal data assistants (hereinafter "PDAs") are small, substantially hand-sized computers that are used for storing, manipulating, and retrieving a defined amount of data. One example of a PDA is the PalmPilot® manufactured by 3Com. The PalmPilot® functions primarily as an electronic day planner and address recorder.

Although PDAs are increasing in popularity, they still have several shortcomings which limit their use. For example, transferring data between a PDA and a personal or network computer is accomplished by physically electrically coupling a cradle to the host computer. The PDA is then physically electrically coupled to the cradle. Software loaded in the host computer is then used to access the PDA and download or upload information therebetween. This process is somewhat time consuming and annoying when all that is wanted is to quickly download or dump information from the PDA into the computer. The problem is exacerbated when it is needed to frequently download information.

Another shortcoming of conventional PDAs is that it is difficult and time consuming to manually input data into the PDA. PDAs typically do not have a keyboard. Information is thus manually input by either using a special pen to scribe letters onto a screen or by selecting letters or numbers displayed on the screen. Such inputing of data can be extremely laborious and time consuming.

### OBJECTS AND BRIEF SUMMARY OF THE INVENTION

Accordingly, it is an object of the present invention to provide PDAs and/or adapters for PDAs that can quickly and easily download information into a host computer without having to physically electrically couple the PDA to the host computer.

Yet another object of the present invention is to provide PDAs and/or adapters for PDAs that can be used to quickly input data into the PDA.

To achieve the foregoing objectives, and in accordance with the invention as embodied and broadly described herein, an adapter for a PDA is provided. The adapter has a substantially L-shaped housing that can be physically and electrically coupled with a conventional PDA. Disposed within the housing of the adapter is a micro processor and a light source which are energized by enclosed batteries. In one embodiment, the light source is a laser. In another embodiment, the light source is a light emitting diode.

The light source emits a light beam which can be converted into a digital signal. This can be accomplished by using a switch which turns the light source on and off. Alternatively, a liquid crystal display (LCD) can be positioned in front of the light source which can then be selectively turned on and off to block the light beam.

When it is desired to download the data stored on the PDA, the micro processor in the adapter transmits a corresponding series of digital pulses using the light source. These pulses are received by a photo detector of a host computer. The photo detector is coupled with a processor

2

which receives, processes, and stores the data stream. The adapter can thus be used to download information from the PDA to a host computer without effecting a physical electrical connection therebetween.

The adapter can also be used to automatically input bar code readings into the PDA. In this embodiment, the light source emits a thin highly culminated light beam such as that used in conventional scanners. By manually moving the combined PDA and adapter, the light beam is scanned across the bar code. A photo detector is mounted on the adapter and is positioned such that the portion of the light beam reflecting off the bar code is received by the photo detector as an analog signal. The analog signal is then converted into a digital signal which is subsequently forwarded to the micro processor and subsequently to the PDA.

As a result of being able to scan bar code readings into the PDA, the functionality of the PDA is substantially increased. For example, the PDA can now effectively be used for monitoring and controlling inventory or other products on which bar codes can be positioned.

In yet another embodiment, it is envisioned that the electronics of the adapter can be integrally incorporated into a PDA so as to eliminate the need for the adapter. However, the adapter is advantageous in retrofitting to existing PDAs. Furthermore, by using the removable adapter, the size of the PDA can be kept to a minimum.

These and other objects, features, and advantages of the present invention will become more fully apparent from the following description and appended claims, or may be learned by the practice of the invention as set forth hereinafter.

### BRIEF DESCRIPTION OF THE DRAWINGS

In order that the manner in which the above-recited and other advantages and objects of the invention are obtained, a more particular description of the invention briefly described above will be rendered by reference to specific embodiments thereof which are illustrated in the appended drawings. Understanding that these drawings depict only typical embodiments of the invention and are not therefore to be considered to be limiting of its scope, the invention will be described and explained with additional specificity and detail through the use of the accompanying drawings in which:

FIG. 1 is a front perspective view of a PDA separated from an adapter;

FIG. 2 is a block diagram of the components of the adapter shown in FIG. 1 and components of a computer;

FIG. 3 is a block diagram of the adapter shown in FIG. 1 interacting with a bar code;

FIG. 4 is a block diagram of the adapter shown in FIG. 1 interacting with a remote controllable device; and

FIG. 5 is a perspective view of a PDA incorporating the electronics of the adapter shown in the FIG. 1.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Depicted in FIG. 1 is one embodiment of an inventive adapter **10** for use with a conventional PDA **12**. PDAs come in a variety of makes, styles, and configurations. In one embodiment of the present invention, PDA **12** includes a PalmPilot® made by 3Com. PDA **12** includes a low profile box shaped case or housing **9** having a front face **14** extending from a top end **16** to a bottom end **18**. Mounted on front face **14** is a display screen **19**. Positioned at bottom

3

end **18** are control buttons **22**. Disposed within housing **9** is a micro processor **11** coupled with memory **13** such as RAM, and batteries **15** for powering the system. The microprocessor interacts with an operating system that runs selective software depending on the intended use of PDA **12**. In one conventional use, memory **13** is loaded with software code for operating an electronic day planner and address notebook.

Adapter **10** has a substantially L-shaped housing **24** which comprises a base **26** and an arm **28**. Arm **28** extends to a free end **30**. In one embodiment, a support back **21** extends between base **26** and arm **28**. The present invention also includes means for removably coupling adapter **10** to PDA **12**. By way of example and not limitation, bottom end **18** of PDA **12** includes a tapered section **20**. Recessed within base **26** is a complimentary socket **32**. Socket **32** is configured to receive tapered section **20** so as to removably secure PDA **12** is to adapter **10**. Of course, there are a variety of alternative configurations which can be used for helping to secure PDA **12** within socket **32**. For example, spring biased members or interlocking ridges can be used for further facilitating the connection. In yet other alternative embodiments, there are a variety of different latches, straps, and connectors that can be used for securely holding PDA **12** to adapter **10**.

Means are also provided for effecting electrical communication between PDA **12** and adapter **10**. By way of example and not limitation, a first interface connector **34** is mounted to bottom **18** of PDA **12**. First interface connector **34** is electrically coupled with the circuitry within PDA **12**. Disposed within socket **32** of adapter **10** is a second interface connector **36**. Interface connectors **34** and **36** are configured to electrically couple together when PDA **12** is coupled to adapter **10**. Interface connectors **34** and **36** permit the transfer of electronic data between PDA **12** and housing **10**. In one embodiment, interface connectors **34** and **36** comprise an RS232 connection.

FIG. 2 in part depicts a functional block diagram of the electrical system of adapter **10**. As depicted therein, interface connector **36** is electrically coupled with a micro processor **38**. Micro processor **38** and the other electrical components are driven by a power source **40**. In one embodiment, power source **40** can comprise the same type of battery system as used in a conventional PDA. Micro processor **38** is selectively operated by a series of control buttons **42**. Control buttons **42** can be positioned on adapter **10** and/or on PDA **12**. In an alternative embodiment, micro processor **38** can be eliminated. In this embodiment, the processing functions would be handled by micro processor **11** within PDA **12**.

In one embodiment, a light source **44** is electrically coupled with micro processor **38**. In other embodiments, light source **44** can be directly coupled with power source **40**. As depicted in FIG. 1, light source **44** is preferably positioned within arm **28** so as to emit a light beam **47** out through a window **46** at free end **30**.

Light source **44** can have a variety of configurations. For example, in one embodiment light source **44** can be a simple light emitting diode such as an infrared emitter. In another embodiment, light source **44** can comprise a laser. In one embodiment, the laser can comprise a red light emitting laser wherein the light is sufficiently collimated that the laser can be used as a conventional laser display pointer for use in lectures or presentations.

Also depicted in FIG. 2 is a simple block diagram of a host computer **70** such as a personal computer or a network computer. Computer **70** includes a photo detector **72**

4

coupled to a processor **74** through an amplifier **76**. A light emitting diode **78** is also electrically coupled to processor **74** and is operated by a driver **80**.

Where light source **44** is used for downloading information from PDA **12** to host computer **70**, means are also provided for converting light beam **47** into a digital signal. This can be accomplished in a variety of different ways. As depicted in FIG. 2, by way of example and not limitation, a switch **48** can be positioned between micro processor **38** and light source **44**. Micro processor **38** operates switch **48** to turn light source **44** off and on at select high frequency intervals such that light beam **47** emitted from light source **44** is converted into a digital signal. The digital signal is transmitted to photo detector **72** of computer **70** and subsequently decoded by processor **74**. Where light source **44** is a laser, the above configuration can be used to download data from PDA **12** to host computer **70** over an extended distance. In one embodiment, light source can be used to download data to host computer **70** over a distance greater than about two feet, preferably greater than about five feet, and more preferably greater than about ten feet.

The transfer is accomplished by aiming light beam **47** at photo detector **72** and then pressing a select control button **42** that instructs micro processor **38** to transfer the stored data in PDA **12** in digital format using light beam **47**. Where light source **44** is simply a light emitting diode, or other non-collimated light source, adapter **10** and PDA **12** may have to be set down close to photo detector **72** and aligned therewith before attempting to transfer the data. In either event, data is quickly and effectively downloaded from PDA **12** to computer **70** without the required use of a cradle or other physical electrical connection.

In yet another alternative embodiment for converting light beam **47** from light source **44** into a digital signal, rather than using switch **48**, a liquid crystal display (LCD) **52** is positioned within adapter **10** in the path of light beam **47**. LCD **52** is controlled to turn on and off by micro processor **38**. When LCD **52** is on, LCD **52** blocks light beam **47** from emanating from adapter **10**. Conversely, when LCD **52** is off, light beam **47** freely emanates from adapter **10**. Accordingly, by micro processor **38** turning LCD **52** on and off at select high frequencies, light beam **47** is converted into digital signals for being received by photo detector **72**.

If desired, comparable technology can also be used to upload data from computer **70** to PDA **12**. By way of example, adapter **10** can include a photo detector **56** that is coupled with micro processor **38** through an amplifier **57**. Digital signals transmitted by LED **78** are received by photo detector **56** and subsequently decoded by micro processor **38** or are transferred to PDA **12** for decoding.

Adapter **10** can also be configured for reading a bar code **54**. For example, as depicted in FIGS. 1 and 3, photo detector **56** is positioned at free end **30** of arm **28** adjacent to window **46**. Photo detector **56** is electrically coupled to an analog to digital converter **58** which is coupled with micro controller **38** through amplifier **57**. Light source **44** and photo detector **56** are selectively positioned such that as light beam **47** is manually scanned across bar code **54**, a portion **61** of light beam **47** is reflected off of the reflective sections of bar code **54** and is received by photo detector **56**. Portion **61** of light beam **47** detected by photo detector **56** is in an analog signal which is converted to a digital signal by converter **58**. The signal is then transferred to microprocessor **38** for decoding and subsequently sent to PDA **12**. In this embodiment, light source **44** emits a thin highly collimated light beam **47** such as those used in conventional scanners.

6,065,880

5

By using the above configuration, bar codes can be quickly entered into PDA 12 without having to manually input the information. Depending on the intended use and operational software, PDA 12 can either simply store the bar code reading or can be used to access other information based on the bar code reading. By using adapter 10, PDA 12 can be used for inventory control or in other situations where bar codes can be used.

Adapter 10 can also interact with PDA 12 to facilitate operation of a remote-controllable device such as a television, VCR, or stereo. As depicted in FIG. 4, a remote-controllable device 80 is depicted as comprising a photo detector 82 which is electrically coupled with a processor 84 and device electronics. By loading appropriate software in PDA 12, light source 44 can be operated by microprocessor 38 to emit low speed pulses to remote-controllable device 80 for remotely controlling the device.

In one embodiment it is envisioned that software code corresponding to a plurality of different remote-controllable device 80 is loaded in memory 13 of PDA 12. Display screen 19 can be used to access a list of available remote-controllable device. By choosing a select remote-controllable device from the list, processor 11 can operate the corresponding software to assign control buttons to perform specific functions relative to operation of the select remote-controllable device. Alternatively, a list of functional operations can be listed on display screen 19. By selecting a desired function, processor 11 or 38 operates light source 44 to emit a desired light pulse that when received by the select remote-controllable device signals the device to perform the desired function. For example, by accessing software on the PDA for a television, depressing a select control button 42 on either PDA 12 or adapter 10 generates a low speed pulse that turns the television on or off. Of course other functions such as volume or channels can also be selectively changed. Performing functions such as downloading data stored in memory 13 of PDA 12 can be executed using similar steps.

It is noted that the operation of adapter 10 for downloading information to computer 70 is different than operation of adapter 10 for remote control of a device. This is because the bit rates are substantially different for the different uses. From a practical standpoint, downloading information from PDA 12 to computer 70 requires a bit rate of about 20 kbps or higher. In contrast, operation of a remote-controllable device requires a bit rate of about 10 bps.

As depicted in FIG. 5, the present invention also envisions that the electronic circuity of adapter 10, as depicted and discussed with regard to FIGS. 1–5, can be integrally incorporated into a single PDA 60. For example, PDA 60 is depicted having a top end 62. Formed at top end 62 is a window 64 through which a light beam from a light source within PDA 60 can emanate. Adjacently positioned to window 64 is photo detector 56. Of course circuitry which is already found in a conventional PDA, such as a micro processor and a power system, need not be redundantly transferred from adapter 10 into PDA 60.

The present invention may be embodied in other specific forms without departing from its spirit or essential characteristics. The described embodiments are to be considered in all respects only as illustrative and not restrictive. The scope of the invention is, therefore, indicated by the appended claims rather than by the foregoing description. All changes which come within the meaning and range of equivalency of the claims are to be embraced within their scope.

6

What is claimed and desired to be secured by United States Letters Patent is:

1. An adapter for removable attachment to a PDA, the adapter comprising:
   (a) an interface connector configured to removably electrically couple with the PDA;
   (b) a micro controller electrically coupled with the interface connector;
   (c) a light source configured to emit a light beam; and
   (d) a photo detector electrically coupled to the micro controller.

2. An adapter as recited in claim 1, wherein the light source is a laser.

3. An adapter as recited in claim 2, further comprising means for converting the light beam from the light source into a digital signal.

4. An adapter as recited in claim 3, wherein the means for converting the light beam comprises switching circuitry for turning the light source on and off.

5. An adapter as recited in claim 3, wherein the means for converting the light beam comprises an LCD positioned in the path of the light beam, the LCD being operable between an on position which blocks the light beam and an off position which allows the light to pass therethrough.

6. An adapter as recited in claim 3, wherein the light source can be used to download data to a computer over a distance greater than about ten feet, without the required use of a cradle or other electrical connection.

7. An adapter as recited in claim 6, wherein a transmission bit rate of the digital signal sent between the adapter and the computer is about 20 kbps or higher.

8. An adapter as recited in claim 1, further comprising means electrically coupled to the micro controller for converting electrical signals between analog and digital.

9. An adapter as recited in claim 8, wherein the light source and the photo detector are configured such that the light beam from the light source can be reflected off a bar code and received by the photo detector.

10. An electrical apparatus comprising:
   (a) a PDA comprising a low profile box shaped case having a front face extending between a top end and a bottom end, a display screen is positioned on the front face and a first interface connector is positioned at the bottom end, the case of the PDA enclosing a microprocessor;
   (b) an adapter comprising:
      (i) a substantially L-shaped housing comprising a base and an arm, the arm projecting from the base to a free end;
      (ii) a second interface connector mounted to the base of the housing, the second interface connector being configured to electrically couple with the first interface connector for transferring electrical signals therebetween;
      (iii) means for removably coupling the housing of the adapter to the PDA such that the first and second interface connectors are electrically coupled and the free end of the arm is positioned at the top end of the PDA case;
      (iv) a light source at least partially disposed within the arm and configured to emanate a light beam through the free end thereof;
      (v) a photo detector at least partially positioned at the free end of the arm; and
      (vi) an analog to digital converter disposed within the housing and electrically coupled to the photo detector.

7

11. An electrical apparatus as recited in claim **10**, wherein a micro processor is disposed within the adapter housing and is electrically coupled with the analog to digital converter.

12. An electrical apparatus as recited in claim **10**, wherein the adapter housing comprises a battery compartment.

13. An electrical apparatus as recited in claim **10**, wherein the light source is a laser.

14. An electrical apparatus as recited in claim **13**, wherein the laser emits a visible red light that is sufficiently collimated to function as a pointer.

15. An electrical apparatus as recited in claim **10**, wherein the adapter further comprises a manual button for turning the light source on and off.

16. An electrical apparatus as recited in claim **10**, wherein the light source and the photo detector are configured such that the light beam from the light source can be reflected off a bar code and received by the photo detector.

17. An electrical apparatus as recited in claim **10**, further comprising an LCD positioned in the path of the light emitting from the light source, the LCD being operable between an on position which blocks light from passing therethrough and an off position which allows light to pass therethrough.

8

18. A PDA comprising:

(a) a housing having a front face extending between a top end and an opposing bottom end, a display screen is positioned on the front face and an interface connector is positioned at the bottom end,

(b) a micro controller is disposed within the housing and is electrically coupled to the connector;

(c) a laser is disposed within the housing and is configured to emit a light beam through the top end of the housing;

(d) a analog to digital converter is disposed within the housing and is electrically coupled with the micro controller;

(e) a photo detector is positioned at the top end of the housing and is configured to receive reflected light from the laser.

19. A PDA as recited in claim **18**, further comprising means for converting light from the laser into a digital signal.

20. A PDA as recited in claim **18**, wherein the laser emits a visible red light that is sufficiently collimated to function as a pointer.

\* \* \* \* \*

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO. : 6,065,880

DATED : May 23, 2000

INVENTOR(S) : Curtis Thompson

It is certified that error appears in the above-identified patent and that said Letters Patent are hereby corrected as shown below:

col. 1, line 8, please change "adapters therefor" to -- adapters --

col. 2, line 7, please change "thin highly" to -- thin, highly --

col. 3, line 34, please change "housing (BOLD)10(BOLD)" to -- housing (BOLD)9(BOLD) --

col. 3, line 35, plese change "RS(BOLD)232(BOLD)" to -- RS232 --

Fig. 2, please change label "80" to -- 79 --; and

col. 4, line 3, please change "driver (BOLD)80(BOLD)" to -- driver (BOLD)79(BOLD) --

col. 4, line 18, please change "embodiment, light source" to -- embodiment, the light source --

col. 4, line 62, please change "is in an" to -- is an --

col. 5, line 29, please change "that when" to -- that, when --

col. 5, line 30, please change " device signals" to -- device, signals --

Signed and Sealed this

Eighth Day of May, 2001

*Attest:*

Nicholas P. Godici

NICHOLAS P. GODICI

*Attesting Officer*

*Acting Director of the United States Patent and Trademark Office*



(12) **EX PARTE REEXAMINATION CERTIFICATE** (8586th)

# United States Patent

Thompson

(10) **Number:** US 6,065,880 C1

(45) **Certificate Issued:** Oct. 4, 2011

(54) **LASER ENHANCED PERSONAL DATA ASSISTANT**

(75) Inventor: **Curtis Thompson**, Salt Lake City, UT (US)

(73) Assignee: **Intellectual Asset Group, LLC**, West Bloomfield, MI (US)

**Reexamination Request:**
No. 90/011,561, Mar. 18, 2011

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **6,065,880** |
| Issued: | **May 23, 2000** |
| Appl. No.: | **09/036,851** |
| Filed: | **Mar. 9, 1998** |

Certificate of Correction issued May 8, 2001.

(51) **Int. Cl.**
*G06F 1/16* (2006.01)

(52) **U.S. Cl.** ............................. **385/88**; 235/454; 710/72

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,621,189 A | 11/1986 | Kumar et al. |
| 4,916,441 A | 4/1990 | Gombrich |
| 4,943,868 A | 7/1990 | Yoshinagawa et al. |
| 4,983,818 A | 1/1991 | Knowles |
| 5,107,100 A | 4/1992 | Shepard et al. |
| 5,202,817 A | 4/1993 | Koenck et al. |
| 5,216,233 A | 6/1993 | Main et al. |
| 5,218,187 A | 6/1993 | Koenck et al. |
| 5,278,399 A | 1/1994 | Sano |
| 5,294,782 A | 3/1994 | Kumar |
| 5,313,051 A | 5/1994 | Brigida et al. |
| 5,313,053 A | 5/1994 | Koenck et al. |
| 5,331,136 A | 7/1994 | Koenck et al. |
| 5,331,580 A | 7/1994 | Miller et al. |
| 5,371,348 A | 12/1994 | Kumar et al. |
| 5,380,994 A | 1/1995 | Ray |
| 5,404,493 A | 4/1995 | Bolme et al. |
| 5,406,063 A | 4/1995 | Jelen |
| 5,410,141 A | 4/1995 | Koenck et al. |
| 5,418,684 A | 5/1995 | Koenck et al. |
| 5,496,992 A | 3/1996 | Madan et al. |
| 5,515,303 A | 5/1996 | Cargin, Jr. et al. |
| 5,521,369 A | 5/1996 | Kumar |
| 5,576,530 A | 11/1996 | Hagerty |
| 5,640,002 A | 6/1997 | Ruppert et al. |
| 5,664,231 A | 9/1997 | Postman et al. |
| 5,679,943 A | 10/1997 | Schultz et al. |
| 5,805,416 A | 9/1998 | Friend et al. |
| 5,821,518 A | 10/1998 | Sussmeier et al. |
| 5,831,819 A | 11/1998 | Chacon et al. |
| 5,834,753 A | 11/1998 | Danielson et al. |
| 5,923,735 A | 7/1999 | Swartz et al. |
| 6,014,705 A | 1/2000 | Koenck et al. |
| 6,023,147 A | 2/2000 | Cargin, Jr. et al. |
| 6,031,524 A | 2/2000 | Kunert |
| 6,041,374 A | 3/2000 | Postman et al. |
| 6,052,279 A | 4/2000 | Friend et al. |
| 6,149,062 A | 11/2000 | Danielson et al. |
| 6,285,916 B1 | 9/2001 | Kadaba et al. |
| 6,497,368 B1 | 12/2002 | Friend et al. |
| 6,895,419 B1 | 5/2005 | Cargin, Jr. et al. |

*Primary Examiner*—Deandra Hughes

(57) **ABSTRACT**

An adapter having an L-shaped housing is configured for removable attachment to a conventional PDA. The adapter is electrically coupled with the PDA and includes a laser or other light source configured to selectively emanate a light beam that can be modified into a digital signal. The digital signal can be received by a photo detector on a computer for facilitating a download of data from the PDA to the computer. The light beam from the laser can also be used as a presentation pointer. The adapter further includes a photo detector which is selectively positioned relative to the laser so that the light beam from the laser can be reflected off a bar code and received by the photo detector. The reflected signal is then converted to a digital signal which is then forwarded to the PDA for storage or access of other corresponding information.



**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claim **18** is determined to be patentable as amended.

Claims **19** and **20**, dependent on an amended claim, are determined to be patentable.

Claims **1-17** were not reexamined.

**2**

**18**. A PDA comprising:

*a single embedded PDA design comprising:*

    (a) a housing having a front face extending between a top end and an opposing bottom end, a display screen is positioned on the front face and an interface connector is positioned at the bottom end,

    (b) a microcontroller is disposed within the housing and is electrically coupled to the connector;

    (c) a laser is disposed within the housing and is configured to emit a light beam through the top end of the housing;

    (d) an analog to digital converter is disposed within the housing and is electrically coupled with the microcontroller

    (e) a photodetector is positioned at the top end of the housing and is configured to receive reflected light from the laser.

\* \* \* \* \*

**PROOF OF SERVICE**

       I hereby certify that on October 28, 2014, I filed the foregoing ***Appellant's Principal Brief*** through this Court's CM/ECF system.  Pursuant to this Court's Administrative Order Regarding Electronic Case Filing (May 17, 2012), ECF-6, the Notice of Docket Activity generated by this Court's CM/ECF system constitutes service of the document on the ***Appellee*** and the ***Intervenor*** because they are represented by the following attorneys who have registered for the CM/ECF system:

       Mitchell S. Feller
       Sobel & Feller LLP
       E-mail: msfellar@sobelfeller.com
       Principal Attorney for
       Appellee Motorola Solutions, Inc.

       Nathan K. Kelley
       Solicitor, United States Patent & Trademark Office
       E-mail: nathan.kelley@uspto.gov
       Principal Attorney for
       Intervenor Director of the United States Patent and Trademark Office

          /s/Charles J. Rogers
          Charles J. Rogers
          Conley Rose, P.C.
          1001 McKinney Street, Suite 1800
          Houston, TX  77002-6421
          Telephone: (713) 238-8049
          Facsimile: (713) 238-8008
          E-mail: CRogers@conleyrose.com

          Principal Attorney for
          Appellant
          Mobile Scanning Technologies, LLC