Appeal No. 2014-1720

# United States Court of Appeals
# for the Federal Circuit

---

**MOBILE SCANNING TECHNOLOGIES, LLC,**

*Appellant,*

v.

**MOTOROLA SOLUTIONS, INC.,**

*Appellee.*

---

Appeal from the United States Patent and Trademark Office
Patent Trial and Appeal Board
Case No. IPR2013-00093
U.S. Patent No. 6,065,880
Issue Date: May 23, 2000
Title: LASER ENHANCED PERSONAL DATA ASSISTANT

Before, SCOTT R. BOALICK, GLENN J. PERRY and
BRIAN J. McNAMARA, *Administrative Patent Judges*

---

## APPELLANT'S REPLY BRIEF

---

CHARLES J. ROGERS
CONLEY ROSE, P.C.
1001 MCKINNEY STREET, SUITE 1800
HOUSTON, TX 77002
(713) 238-8049
*Principal Attorney*

**Attorney for Appellant Mobile Scanning Technologies, LLC**

January 29, 2015

# CERTIFICATE OF INTEREST

Counsel for Patent Owner-Appellant Mobile Scanning Technologies, LLC certifies the following:

1.  The full name of every party or amicus represented by me is:

    Mobile Scanning Technologies, LLC

2.  The name of the real party in interest represented (if the party named in the caption is not the real party in interest) by me is:

    Not applicable.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

    None

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

Conley Rose, P.C.

Charles J. Rogers

Paul M. Schwartz
Mobile Scanning Technologies, LLC

/s/Charles J. Rogers
Charles J. Rogers
Conley Rose, P.C.
1001 McKinney Street, Suite 1800
Houston, TX  77002-6421
Telephone: (713) 238-8049
Facsimile: (713) 238-8008
E-mail: CRogers@conleyrose.com

Principal Attorney for
Appellant
Mobile Scanning Technologies, LLC

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES .................................................................. iv

TABLE OF ABBREVIATIONS ...............................................................v

I.  SUMMARY OF ARGUMENT ....................................................1

II. ARGUMENT ...................................................................................4

    A.  Standard of Review – *Teva v. Sandoz* ................................. 4

    B.  The PTAB Erred In Its Construction of "PDA" by Applying
        The Incorrect BRI Standard. ................................................. 7

        1.  The PTO's justifications for using the BRI standard do
            not apply in the context of the new IPR procedure ...................7

        2.  The PTO exceeded its rulemaking authority by
            implementing the BRI standard in IPR .....................................10

    C.  The PTAB's Construction of "PDA" Is Incorrect under The
        BRI Standard and *Phillips* .................................................. 12

        1.  The '880 Patent specification's reference to some (but
            not all) features of a PDA is not a complete "Express
            Definition" for the purpose of claim construction ...................12

        2.  The two most basic defining features of a PDA are the
            personal data (the "P" and the "D" in "PDA") and the
            ability to synchronize the personal data with a host
            computer .....................................................................................16

    D.  The PTAB Erred in Cancelling Claims 18-20 under §§ 102 and
        103. ....................................................................................... 18

        1.  Ruppert and PPT4100 do not disclose all limitations of
            Claims 18 and 20 .......................................................................18

  2.  Neither Ruppert and Dvorkis nor PPT4100 and SE1000 render obvious all limitations of Claims 18-20. .......................20

III. CONCLUSION AND RELIEF REQUESTED.............................................22

PROOF OF SERVICE ..........................................................................1

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)(7).........................................................2

# TABLE OF AUTHORITIES

Page(s)

## U.S. Supreme Court Cases

Dickinson v. Zurko,
    527 U.S. 150 (1999) ................................................................5

Teva Pharmaceuticals USA, Inc., v. Sandoz, Inc.,
    135 S. Ct. 831 (2015) ...........................................................5, 6

Thermtron Products, Inc. v. Hermansdorfer,
    423 U. S. 336 (1976) ............................................................11

Whitman v. American Trucking Association,
    531 U.S. 457 (2001) .............................................................10

## U.S. Court of Apeals Cases

In re Gartside,
    203 F.3d 1305 (Fed. Cir. 2000) .............................................5

In re Skvorecz,
    580 F.3d 1262 (Fed. Cir. 2009) ...........................................11

Phillips v. AWH Corp.,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) .................... 7, 9, 12

Tafas v. Doll,
    559 F.3d 1345 (Fed. Cir. 2009) ...........................................10

## Statutes

35 U.S.C. § 154 ........................................................... 10, 12

35 U.S.C. § 316 ................................................... 8, 9, 10, 11

5 U.S.C. § 706 ...............................................................5

## Rules and Regulations

37 C.F.R. § 1.121 ...............................................................8

37 C.F.R. § 42.121 ...........................................................8, 9

MPEP § 2258 ...................................................................9

# TABLE OF ABBREVIATIONS

*Parties*

| | |
|---|---|
| MST | Patent Owner-Appellant Mobile Scanning Technologies, LLC |
| Motorola | Petitioner-Appellee Motorola Solutions, Inc. |

*Cites*

| | |
|---|---|
| A__ | Joint Appendix at page(s) __, with (column:lines) for patents |

*Terms*

| | |
|---|---|
| '880 Patent | U.S. Patent No. 6,065,880 to MST |
| AIA | Leahy-Smith America Invents Act |
| BRI | Broadest Reasonable Interpretation |
| Court | United States Court of Appeals for the Federal Circuit |
| Dvorkis | U.S. Pat. No. 5,552,592 to Dvorkis et al. |
| IPR | *Inter Partes* Review |
| Petition | Motorola's Petition for *Inter Partes* Review of the '880 Patent |
| PPT4100 | PPT4100 System Administration Manual |
| PTAB | Patent Trial and Appeal Board |
| PTO | United States Patent and Trademark Office |
| Ruppert | U.S. Pat. No. 5,424,524 to Ruppert et al. |
| SE1000 | SE1000 Series Integration Guide |

# I.    SUMMARY OF ARGUMENT

The PTAB overbroadly construed the claim term "PDA" to mean:

> a substantially hand-sized computer used for storing and manipulating an amount of data and capable of exchanging information with a host.

A9.  The PTAB construed the term "PDA" so overbroadly that it does not even require "personal data."  The title of the '880 Patent is "Laser Enhanced <u>Personal Data</u> Assistant."  A22 (emphasis added).  At the outset of the Claim Construction section of its Final Written Decision, the PTAB noted that it was construing "the term '<u>personal data</u> assistant' (PDA)."  A4 (emphasis added); ***see also*** A28 (1:11) ('880 Patent Background of the Invention: "Personal data assistants (hereinafter 'PDAs') ....").  The "P" and the "D" in the term "PDA" refer to "personal data" such as the calendar appointments and contacts list addresses in a PDA performing its customary conventional function as an electronic day planner and address book.  A29 (3:5-7).

The PTAB's overbroad construction disregards the "P" and the "D" in the term "PDA," to leave out one of the most basic defining features of a PDA, its handling of personal data.  But most important to this appeal, the overbroad construction also leaves out the other most basic defining feature of a PDA, which is the device's ability to synchronize this personal data with a host computer.

The term PDA was first introduced by Apple CEO John Sculley during the launch of the Apple Newton in 1992, which was the first device to be referred to as a PDA because the term was coined specifically for it. A2786 ¶ 11. By 1995, Palm Pilot products became the *de facto* standard for PDA products in the marketplace. ***Id.*** The Palm Pilot PDA became the market standard and defining product over earlier products, including Apple's Newton, because the Palm Pilot PDA both intended to and did replace paper and pencil applications such as paper-based calendars and to-do lists, but did not replace the host computer itself. ***Id.***

Data synchronization with a host computer is central to the function of a PDA device. ***Id.*** ¶ 13. As an example, both the Apple Newton and the Palm Pilot had the ability to synchronize data between their personal data applications (***e.g.*** calendar/contacts) and a copy of that same data stored on a host computer. ***Id.***

The ability to synchronize personal data with a host computer was important to purchasers of a PDA device for at least two reasons: 1) losing a day planner, which is a paper version of a PDA, would cause a significant hardship for the user, whereas losing a PDA would not result in any loss of calendar appointments or other personal information because such data is retained on a host computer through synchronization of a PDA with the host computer, and 2) this feature allowed a user (or their real life personal assistant) to enter data either at a host computer or in the PDA device itself. ***Id.***

The '880 Patent discloses and claims improvements to the PalmPilot® to allow for wireless syncing using an LED or infrared laser light connection, freeing the PalmPilot® from its HotSync cradle. *See* A1856-1924, Pilot Handbook, showing the HotSync cradle connected to a host computer at A1864. Prior to the invention, the PalmPilot® and other PDA devices had to be physically or electrically connected (by a wire) to their host computer for data syncing. A28 (1:17-28) ('880 Patent Background of the Invention section describing the syncing cradle connected the host computer as a shortcoming of PDAs that limit their use). Prior to the invention, PDAs did not have the wireless syncing capability that we take for granted now with our smartphones.

In addition to wireless syncing, the same electronics used for the wireless syncing could then allow the PDA to function as a bar code scanner. A28 (2:5-24). The '880 Patent describes the bar code scanning capability as substantially increasing the functionality of the PDA, which then, for example, in addition to performing its customary conventional PDA function as an electronic day planner having its personal data synced with a host computer, could also be used as an inventory monitoring and controlling device. *Id.* (2:16-20). The wireless syncing improvement to the PalmPilot® resulted in the first PDA having an integrated bar code scanner. Claims 18-20 of the '880 Patent claim this invention by reciting the term "PDA' in the preamble of each claim. A31 (8:1-20); A34 (2:1-2).

The PTAB overbroadly construed the claim term PDA to leave out the two most basic defining features of a PDA, which are the "P" and the "D" in the PDA, the personal data, and the device's ability to synchronize this personal data with a host computer. MST respectfully requests that this Court correct this overbroad claim construction and apply MST's proposed construction as follows, which includes these most basic defining features of a PDA:

A PDA is a subset of handheld computers that:

a) include personal assistance applications to manage personal data, as suggested in the name "personal data assistant"; and

b) have the ability to synchronize data from these applications with a host computer.

MST further respectfully requests that this Court apply this corrected claim construction to reverse the PTAB's cancellation of Claims 18-20 of the '880 Patent because none of the prior art relied on by the Board discloses a PDA, as properly construed to synchronize personal data with a host computer.

## II.    ARGUMENT

### A.    Standard of Review – *Teva v. Sandoz*

Both MST and Motorola noted in their Principal Briefs that claim construction is reviewed *de novo*, with no distinction in the standard of review for any underlying fact findings. Following the filing of those briefs, the Supreme Court issued its January 20, 2015 decision in ***Teva Pharmaceuticals USA, Inc., v.***

*Sandoz, Inc.*, 135 S. Ct. 831 (2015), which held that the Federal Circuit must apply a more deferential "clear error" standard of review when reviewing "a district court's resolution of subsidiary factual matters made in the course of its construction of a patent term." *Id.* at 836 (relying on Federal Rule of Civil Procedure 52(a)(6), which states that a court of appeals "must not . . . set aside" a district court's "[f]indings of fact" unless they are "clearly erroneous.").

Applying the Supreme Court's *Teva* holding to this Court's review of claim construction rulings from the PTAB would mean that the "substantial evidence" standard of review should be used for any fact findings underlying the PTAB's claim construction. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000) (concluding that the substantial evidence standard is appropriate for this Court's review of Board factfindings) (relying on the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706(2)(E), in response to the Supreme Court's *Dickinson v. Zurko*, 527 U.S. 150 (1999) decision reversing this Court's *en banc* decision which had held that the appropriate standard of review of PTO findings of fact was the clearly erroneous standard). As this Court reviews the PTAB's legal conclusions of obviousness *de novo*, and reviews any underlying factual findings for substantial evidence, this Court should review the PTAB's legal conclusion of claim construction *de novo*, and review any underlying factual findings for substantial evidence.

This Court should review the PTAB's construction of the claim term "PDA" *de novo*. The PTAB effectively made no fact findings underlying its claim construction because the PTAB rejected all of the extrinsic evidence proffered by MST, and relied solely on intrinsic evidence to support its claim construction. The PTAB in its claim construction decision recited some of the extrinsic evidence proffered by MST, through its expert Dr. Ikhlaq Sidhu, but disregarded all of that extrinsic evidence by rejecting it for not being intrinsic.

The PTAB refused to look beyond the patent's intrinsic evidence, and refused to consult the extrinsic evidence in order to understand the meaning of the term "PDA" to one of ordinary skill in the art at the time of the invention. As such, the PTAB's claim construction is akin to the type of analysis described in the *Teva* decision as amounting "solely to a determination of law" for this Court to review *de novo*, when "a district court reviews only evidence intrinsic to the patent (the patent claims and specifications, along with the patent's prosecution history)." *Teva*, 135 S. Ct. at 841.

But regardless of whether this Court reviews all aspects of the PTAB's claim construction *de novo*, or provides the more deferential "substantial evidence" standard of review to some underlying aspects such as the PTAB's rejection of the extrinsic evidence, this Court should reverse the PTAB's overbroad construction of the term "PDA" for leaving out the two most basic defining features of a PDA,

which are the personal data (the "P" and the "D" in the term "PDA"), and the device's ability to synchronize this personal data with a host computer.

**B.    The PTAB Erred In Its Construction of "PDA" by Applying The Incorrect BRI Standard.**

As the Intervenor Director notes in its Principal Brief, there are at least three other appeals before this Court in which a challenge is asserted to the use of the BRI standard of claim construction in inter partes reviews, and at least one other similar challenge for covered business method reviews.    PTO.Br. 1, n.1. Considering that each of these other cases is in a more advanced stage than this appeal, it is likely that the issue will be resolved by this Court in advance of the conclusion of this appeal.  But regardless of the outcome on this issue, MST asserts that the PTAB's construction of the term "PDA" is overbroad and incorrect under both BRI and ***Phillips v. AWH Corp.***, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).[1]

**1.  The PTO's justifications for using the BRI standard do not apply in the context of the new IPR procedure**

The PTO proffers three justifications for using the BRI standard:  (1) "it's always been this way";  (2) the patent owner has "an opportunity" to amend the

---

[1]    This section adopts the analysis and arguments of the Appellant Cuozzo Speed Technologies, LLC in its Reply Brief at pages 16-20 in Appeal No. 2014-1301 (argued November 3, 2014), which responded to pages 39-45 of the Intervenor Director's Principal Brief, which is repeated nearly verbatim by the Director as its Principal Brief pages 7-13 in the instant appeal.

claims; and (3) a combined proceeding would require application of different claim construction standards. PTO.Br. 7-8. None of these assertions justify using the BRI standard in IPRs.

First, the "it's always been this way" rationale carries no weight in the context of IPR, a new procedure which the PTO has never implemented. As the PTO would admit, IPR is not examinational. Yet, the PTO asserts that this Court's precedent related to appeals from examinational proceedings somehow supports use of the BRI standard in IPR. PTO.Br. 8. Because there is no substantive similarity between IPR and any proceeding the PTO has ever conducted, it is only logical that the PTO should not be relying on past, examinational practices to implement a process in which examiners never participate.

Second, "the opportunity to seek to amend the patent" in IPR (PTO.Br. 9) is not in any way coextensive with the right to amend in examinational proceedings before the PTO. 37 C.F.R. § 1.121 ("Amendments in applications…are made by filing a paper…directing that specified amendments be made."). The AIA places severe strictures on a patent owner's ability to amend the claims, none of which occur in the examinational context. Most importantly, the patent owner has no right to amend the claims (as he does in examination); an amendment in IPR requires a motion in which the patent owner bears the burden of proving that the amendment should be entered. 35 U.S.C. § 316(d)(1); 37 C.F.R. § 42.121. And,

the patent owner is allowed only one such motion. 35 U.S.C. § 316(d)(1); 37 C.F.R. § 42.121. Further, the only amendment allowed in IPR is the cancellation of claims and/or the substitution of claims; no new, additional claims are permitted as in examinational proceedings. 35 U.S.C. § 316(d)(1); 37 C.F.R. 42.121. This extremely narrow "opportunity" to amend the claims stands in stark contrast to the broad right to amend the claims, which includes filing new claims, in the examinational context, and does not justify use of the BRI standard.

Finally, the PTO asserts that if it is required to employ different standards in different proceedings -- the BRI standard in the examinational context and the *Phillips* standard in IPR – such "would also hamper the USPTO's statutory authority to combine different proceedings concerning the same patent." PTO.Br. 11. This makes little sense. The combined proceeding would not be some mythical creature which is, for example, half-reexamination and half-IPR. The combined proceeding would have to be designated as an examination, a reissue, a reexamination, or a post-grant proceeding. Those are the only proceedings that the PTO has the authority and regulations to conduct. Further, the PTO already employs multiple standards in the same proceeding, *e.g.*, applying different claim construction standards in a reexamination before and after patent expiration. MANUAL OF PATENT EXAMINING PROCEDURE (MPEP) § 2258.

Accordingly, there is no justification for using the BRI standard in the nonexaminational setting of IPR.

### 2. The PTO exceeded its rulemaking authority by implementing the BRI standard in IPR

Congress has granted the PTO only "procedural" rulemaking authority. *Tafas v. Doll*, 559 F.3d 1345, 1352 (Fed. Cir. 2009). But, the BRI standard is a substantive rule that affects an individual right, *i.e.*, the right to exclude conferred by the patent grant. 35 U.S.C. § 154(a)(1) ("Every patent shall contain … a grant to the patentee … of the right to exclude others from making, using, offering for sale, or selling the invention"). The PTO asserts that its authority to promulgate rules implementing the BRI standard is derived from (i) its authority under § 316(a)(4) to prescribe regulations "establishing and governing inter partes review under this chapter and the relationship of such review to other proceedings under this title," and (ii) prior practice in examinational proceedings. PTO.Br. 12-13.

This Court has previously held that "Congress has not vested the Commissioner with any general substantive rulemaking power." *Tafas*, 559 F.3d at 1352. Yet, the PTO asserts that Congress "hid the elephant in the mousehole" by providing substantive rulemaking authority in a subsection of 35 U.S.C. § 316. *Whitman v. American Trucking Association*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory

10

scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes").  To the contrary, § 316(a) sets forth thirteen separate areas of regulations that are required for IPR.  As the PTO implicitly realizes (by citing solely to subsection (4)), all of these areas are directed to procedural facets of IPR.  *See, e.g.*, § 316(a)(1)  (filings not under seal should be made publicly available); § 316(a)(6)  (sanctions may be administered); § 316(a)(7)  (protective orders are available).  However, the PTO claims that the terms "establishing and governing" in subsection (a)(4) do not relate to procedural requirements, like all of the other subsections of § 316(a), but give it the broad power to promulgate substantive standards for claim interpretation.  PTO.Br. 12.  But when reading (a)(4) *in pari materia* with the twelve other subsections of § 316(a), it is abundantly clear that PTO's rulemaking authority is limited to procedural facts of IPR.  *See Thermtron Products, Inc. v. Hermansdorfer*, 423 U. S. 336, 345 (1976) (holding that statutory subsections are "*in pari materia*" and "must be construed together").

The PTO further asserts that the BRI standard is "procedural," because it "does not prescribe what is patentable and what is not" and "[i]t is simply 'an examination expedient.'"  PTO.Br. 12-13 (quoting *In re Skvorecz*, 580 F.3d 1262, 1267 (Fed. Cir. 2009)).  To the contrary, it is hard to imagine a more substantive consideration than the scope of the claims, which defines the boundaries of the

right to exclude granted to the patentee. 35 U.S.C. § 154(a)(1) ("Every patent shall contain … a grant to the patentee … of the right to exclude others from making, using, offering for sale, or selling the invention").  Further, the PTO admits that the BRI standard is used only as "an examination expedient," but would also admit that IPR is not an examinational proceeding.  Because IPR is not examinational, the BRI standard has no place in it.

## C.    The PTAB's Construction of "PDA" Is Incorrect under The BRI Standard and *Phillips*.

The PTAB erred in its application of the BRI standard for claim construction; the *Phillips* standard should have been applied to construe claim terms and, in particular, the term "PDA."   But regardless of which standard applies, the construction of "PDA" adopted by the PTAB is incorrect under both the BRI and *Phillips* standards, because the construction is overbroad for leaving out the most basic defining feature of a PDA – the syncing of personal data.

### 1.  The '880 Patent specification's reference to some (but not all) features of a PDA is not a complete "Express Definition" for the purpose of claim construction

Motorola's primary basis for justifying the PTAB's overbroad construction of the term "PDA" is the '880 Patent specification's reference to some (but not all) of the features of a PDA, which Motorola argues is an "express definition" of the

term "PDA" for the purpose of claim construction. The '880 Patent specification refers to some of the features of a PDA as being "small, substantially hand-sized," and a "computer" used for "storing, manipulating, and retrieving" data. A28 (1:11-13). The fact that there is no reference to "personal data" (the "P" and the "D" in the term "PDA"), in the portion of the specification that Motorola argues is an "express definition" of the term, confirms that this reference to features of a PDA is not an all-inclusive definition of the term for the purpose of claim construction.

Furthermore, in addition to immediately following this description of some of the features of a PDA by referring to an example of a PDA (the PalmPilot®) that "functions primarily as an electronic day planner and address recorder," (*id.* at 1:13-15), the specification later describes the customary "conventional use" of a PDA as "an electronic day planner and address book." *Id.* at 3:5-8. This is the specification describing the "personal data" function of a PDA, its defining feature that is the "P" and the "D" in the term "PDA."

The '880 Patent specification further describes the invention as improvements to PDAs to allow for wireless syncing using an LED or infrared laser light connection, freeing PDAs from the cradle that was their wired connection to host computers. The cradle is not just any holder for PDAs, it is a syncing cradle. For the PalmPilot® it was called the "HotSync" cradle. *See* A1856-1924, Pilot Handbook, showing the HotSync cradle connected to a host

computer at A1864 (emphasis added). Prior to the invention, the PalmPilot® and other PDA devices had to be physically or electrically connected (by a wire) to their host computer for personal data syncing. A28 (1:17-28) ('880 Patent Background of the Invention section describing the syncing cradle connected the host computer as a shortcoming of PDAs that limit their use). Prior to the invention, PDAs did not have the wireless syncing capability that we take for granted now with our smartphones.

Although Motorola continues to assert its "express definition" argument to this Court, the PTAB rejected the argument by taking the alleged "express definition" from the '880 Patent specification and modifying it to devise its overbroad construction of the term "PDA." The PTAB modified the alleged "express definition" by removing some aspects, such as "retrieving" data, and by adding other aspects. But most importantly, to reach an overbroad construction the PTAB left out the "personal data," and did not specify that the added "exchanging information with a host" is synchronization of the personal data with the host computer – the two most basic defining features of a PDA.

This can be seen from a comparison of the Board's overbroad construction with the alleged "express definition" from the patent specification. The PTAB construed the term "PDA" to mean:

> a substantially hand-sized computer used for storing and manipulating an amount of data and capable of exchanging information with a host.

The PTAB devised this overbroad construction by modifying the alleged "express definition" as follows:

> a ~~small,~~ substantially hand-<u>sized</u> ~~held~~ computer~~s that are~~ used for storing~~,~~ <u>and</u> manipulating~~, and retrieving a defined~~ <u>an</u> amount of data <u>and capable of exchanging information with a host</u>.

The PTAB 1) did not include "personal data"; 2) deleted "small" and changed "hand-held" to "hand-sized"; 3) deleted "retrieving"; 4) changed "defined amount of data" to "an amount of data"; and 5) added "capable of exchanging information with a host."

The critical errors in this process were leaving out the "personal data" and failing to specify that the "exchanging information with a host" is synchronization of the personal data with the host computer.

The PTAB could have reached a correct construction by including the "personal data" and specifying that "exchanging information with a host" is synchronization of the personal data with the host computer.

### 2. The two most basic defining features of a PDA are the personal data (the "P" and the "D" in "PDA") and the ability to synchronize the personal data with a host computer

The two most basic defining features of a PDA are the handling of personal data (the "P" and the "D" in "PDA"), and the ability to synchronize this personal data with a host computer. The correct definition of a PDA must include the ability to synchronize personal data; otherwise the device cannot properly perform its customary conventional function as an electronic day planner. Without synchronization of personal data with a host computer, users would be left without the safeguard of being able to lose their device without losing their precious personal data, combined with the ability to add personal data from either the host computer or the device itself.

The first aspect of this synchronization, which allows for one to lose the device without losing data, is what we refer to as backing up the device data to the host computer. But the synchronization further provides the additional aspect, which allows a user (or their real life personal assistant) to enter data either at a host computer or in the PDA device itself. This is the synchronization that allows the PDA to perform its customary conventional function as an electronic day planner.

MST's expert Dr. Sidhu compiled a list of approximately 46 devices that could be classified as PDAs, on the market beginning in 1992 when the term PDA

was coined, and up to the March 9, 1998 filing date of the application that issued as the '880 Patent. A2787, 2809-11. Dr. Sidhu confirmed that each of these devices had personal data applications and the ability to synchronize the data with a host computer. A2787-88. This extrinsic evidence further confirms that the definition of a PDA should include personal data syncing.

Motorola criticizes Dr. Sidhu by asserting that some of those devices may be better classified as "handheld PCs." But whether a device that has personal data syncing is more accurately classified as a PDA or a handheld PC is not the issue. MST is not asserting that PDAs are the only devices that can sync personal data with a host computer. Rather, MST asserts that in order to be classified as a PDA, a device must have personal data syncing. That's why the term "PDA" must be construed to include personal data synchronization, and that's why the prior art asserted by Motorola to challenge the '880 Patent claims are not PDAs, because none have the personal data syncing feature.

If personal data syncing did not belong in the construction of the claim term "PDA," because personal data syncing was not a required feature for a device to be classified as a PDA, then Motorola would be pointing to a device classified as a PDA that does not have personal data syncing. Motorola has not because they cannot. All PDAs have personal data syncing because the two most basic defining

features of a PDA are the personal data (the "P" and the "D" in the PDA), and the device's ability to synchronize this personal data with a host computer.

### D. The PTAB Erred in Cancelling Claims 18-20 under §§ 102 and 103.

MST respectfully requests that this Court apply a corrected claim construction to reverse the PTAB's cancellation of Claims 18-20 of the '880 Patent, because none of the prior art relied on by the Board discloses or suggests a PDA, as properly construed to synchronize personal data with a host computer.

#### 1. Ruppert and PPT4100 do not disclose all limitations of Claims 18 and 20.

After finding that Claims 18 and 20 were anticipated by Ruppert and PPT4100 under its overbroad construction of the term "PDA," the PTAB piled on with a conclusory finding that these claims would also be anticipated by this same art under MST's proposed construction. A11, 13, 14. The PTAB did not find that Ruppert or PPT4100 disclosed a PDA under MST's proposed construction of the term, but instead took a different approach. The PTAB asserted that the '880 patent "specification states that the PDA is conventional." A11, 13. The PTAB then said that Ruppert and PPT4100 disclose conventional devices. *Id.* The PTAB then concluded that "thus" Ruppert and PPT4100 anticipate Claims 18 and 20.

A11, 13, 14. That was the full extent of the PTAB's anticipation analysis to find these claims anticipated under MST's proposed claim construction.[2]

In addition to being a false syllogism, which should never be allowed to support an anticipation finding, these anticipation findings are based on a misreading of the '880 Patent specification. The specification does not state that the "PDA is conventional" as the PTAB asserts to then read to mean any conventional device. The specification states that the invention is "for use with a conventional PDA." A28 (2:60-61). In the process of this analysis, which the PTAB presented as using MST's proposed construction of the term "PDA," the PTAB effectively reverted to its overbroad construction, and did not find that Ruppert and PPT4100 disclose a PDA with synchronization of personal data with a host computer.

Motorola asserts in its Principal Brief that the PTAB "specifically found that Ruppert discloses a hand-held computer that runs a personal shopping application and that 'synchronizes its data with a host computer'." Pet.'s Br. 32 (purportedly quoting the PTAB's Final Written Decision at A532). Motorola clipped a quote from the PTAB's obviousness ruling, which actually said that "Ruppert discloses

---

[2]  The PTAB's attention to its anticipation analysis was so limited that when it duped its anticipation findings from the Ruppert section to the PPT4100 section, the concluding sentence, which meant to say that PPT4100 anticipates Claim 18, instead just repeats the previous finding that "Ruppert anticipates claim 18." A13.

19

that it would have been obvious for a PDA with the claimed structure to run a personal application that synchronizes its data to a host computer." A15 (emphasis added). This obviousness finding, misrepresented to be an anticipation finding, does not support the PTAB's conclusory anticipation findings.

MST respectfully requests that this Court apply a corrected claim construction to reverse the PTAB's anticipation findings, because the PTAB made no finding that Ruppert or PPT4100 disclose a PDA, as properly construed to synchronize personal data with a host computer, and because there is no substantial evidence to support any such anticipation finding because Ruppert and PPT4100 do not disclose a PDA, as properly construed to synchronize personal data with a host computer.

### 2. Neither Ruppert and Dvorkis nor PPT4100 and SE1000 render obvious all limitations of Claims 18-20.

After finding that Claims 18-20 were obvious over a combination of Ruppert and Dvorkis, and a combination of PPT4100 and SE1000, under its overbroad construction of the term "PDA," the PTAB concluded that these claims would also be obvious over the Ruppert/Dvorkis combination under MST's proposed construction. A13. The PTAB did not find that any claims would be obvious over the PPT4100/SE1000 combination under MST's proposed construction.

MST respectfully requests that this Court apply a corrected claim construction to reverse the PTAB's obviousness conclusions for Claims 18-20 of the '880 Patent, because none of the prior art relied on by the Board discloses or suggests a PDA, as properly construed to synchronize personal data with a host computer.

The PTAB's obviousness finding for the Ruppert/Dvorkis combination, purportedly made under MST's proposed construction, was based on the PTAB's assertion that Ruppert discloses a hand-held scanner for a shopper, which downloads a price list from the store's computer, scans items into the device while shopping, and the uploads the scanned information to the store's computer when checking out. A15. The Board concluded from this disclosure that "it would have been obvious for a PDA with the claimed structure to run a personal application that synchronizes its data to a host computer." *Id.* It is apparent from the PTAB's description that it was not using MST's proposed construction including synchronization of personal data with a host computer, as opposed to the general transferring of information by downloading from the host computer to the device, and then uploading from the device to the computer host. There is no mention of synchronizing in the PTAB's decision, and there is no disclosure of synchronizing in Ruppert. Nor did the PTAB make any findings as to motivation to combine.

For these reasons, in addition to those set forth in MST's Principal Brief on these obviousness issues, MST respectfully requests that this Court reverse the PTAB's obviousness conclusions for Claims 18-20 of the '880 Patent.

## III. CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Appellant respectfully requests that this Court reverse the PTAB's final written decision cancelling Claims 18-20. Alternatively, Appellant respectfully requests that this Court reverse and remand for reconsideration of MST's motion to amend the claims based on the correct interpretation of "PDA," and under the appropriate claim construction standard.

Respectfully submitted,

/s/Charles J. Rogers
Charles J. Rogers
Conley Rose, P.C.
1001 McKinney Street, Suite 1800
Houston, TX 77002-6421
Telephone: (713) 238-8049
Facsimile: (713) 238-8008
E-mail: CRogers@conleyrose.com

Principal Attorney for
Patent Owner-Appellant
Mobile Scanning Technologies, LLC

**PROOF OF SERVICE**

I hereby certify that on January 29, 2015, I filed the foregoing ***Appellant's Reply Brief*** through this Court's CM/ECF system. Pursuant to this Court's Administrative Order Regarding Electronic Case Filing (May 17, 2012), ECF-6, the Notice of Docket Activity generated by this Court's CM/ECF system constitutes service of the document on the ***Appellee*** and the ***Intervenor*** because they are represented by the following attorneys who have registered for the CM/ECF system:

  Mitchell S. Feller
  Sobel & Feller LLP
  E-mail: msfellar@sobelfeller.com
  Principal Attorney for
  Appellee Motorola Solutions, Inc.

  Nathan K. Kelley
  Solicitor, United States Patent & Trademark Office
  E-mail: nathan.kelley@uspto.gov
  Principal Attorney for
  Intervenor Director of the United States Patent and Trademark Office


      /s/Charles J. Rogers
      Charles J. Rogers
      Conley Rose, P.C.
      1001 McKinney Street, Suite 1800
      Houston, TX 77002-6421
      Telephone: (713) 238-8049
      Facsimile: (713) 238-8008
      E-mail: CRogers@conleyrose.com

      Principal Attorney for
      Appellant
      Mobile Scanning Technologies, LLC

## CERTIFICATE OF COMPLIANCE
## WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)(7)

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because it contains  5,104  words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point font.

Dated: January 29, 2015

/s/Charles J. Rogers
Charles J. Rogers
Conley Rose, P.C.
1001 McKinney Street, Suite 1800
Houston, TX  77002-6421
Telephone: (713) 238-8049
Facsimile: (713) 238-8008
E-mail: CRogers@conleyrose.com

Principal Attorney for
Appellant
Mobile Scanning Technologies, LLC